STATE OF NEBRASKA, APPELLEE, V.
BILLY R. BILLUPS, APPELLANT.

311 N.W.2d 512

Filed October 23, 1981.   No. 43693.

Thomas M. Kenney, Douglas County Public Defender, and Stanley A. Krieger for appellant.

Paul L. Douglas, Attorney General, and Dale D. Brodkey for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, WHITE, and HASTINGS, JJ.

KRIVOSHA, C.J.

The appellant, Billy R. Billups (Billups), appeals from a conviction based upon a jury verdict which had found Billups guilty of committing a violation of Neb. Rev. Stat. § 28-324(1) (Reissue 1979), robbery, a Class II felony; a violation of Neb. Rev. Stat. § 28-1205(1) (Reissue 1979), using a firearm to commit a felony, a Class III felony; and a violation of Neb. Rev. Stat. § 28-308(1) (Reissue 1979), assault in the first degree, a Class III felony. Billups was sentenced to a term of 15 to 20 years on the robbery charge; 5 to 20 years on the use of a firearm charge, to be served consecutively to the robbery sentence; and 5 to 20 years on the

first degree assault charge, to be served concurrently with the robbery sentence and use of a firearm sentence.

Billups assigns two errors. The first error assigned by Billups is that the trial court erred in refusing to suppress evidence seized at appellant's home while making an alleged unlawful arrest. The second assignment of error claimed by Billups is that the trial court erred in failing to instruct the jury on a lesser-included offense of second degree assault, as requested by Billups. We believe that appellant's claim of error in both instances must be denied and the judgment and sentences affirmed in all respects.

We shall discuss the assignments of error in the order presented by appellant. Before doing so, however, a brief summary of the facts is necessary.

On the morning of March 27, 1980, Gary Cady was working at the Imperial Oil Company gas station in Omaha, Nebraska. At about 8:15 a.m. he noticed two males sitting in a car near the air pump. One of the men, whom Cady later identified as Billups, came into the station and asked for change. Cady indicated to Billups that he did not have any money with him. Billups then began to talk about the old manager who used to help him out. The conversation lasted about 3 or 4 minutes and Billups departed the station. After Cady had pumped gas for a number of cars he went back inside the station to put the money into the safe. At that point Billups entered the station again and headed toward the men's room. He was wearing a "long gray coat with checks on it." He suddenly jumped back and displayed a revolver which he pointed at Cady and ordered him to "step on back here." Cady went into the backroom of the station and was ordered to lie down on the floor and not move. While Cady was lying on his stomach Billups took Cady's billfold and the coin changer and asked him for the keys to the safe. Cady told Billups that he did not have the keys for the bottom safe but did for the top

safe. While Cady was getting up to get the keys out of his coat pocket, Billups proceeded to shoot Cady, once in the shoulder or arm, which knocked him back, and a second time in the chest, right above the heart. Cady fell to the floor, at which time Billups shot him again. At that point Billups fled the station, taking with him $75.10.

Shortly thereafter help arrived and the police were summoned. Before Cady was taken to the hospital he gave a description of Billups to the police. Cady also described the coat which Billups was wearing. It was a long gray coat with checks of black or gray.

At the hospital Cady had one bullet surgically removed from his right shoulder, the other bullets having glanced off of him. The hospital personnel had to dig the bullet out and then sew up the wound. At the hospital Cady identified Billups as the robber from numerous photographs shown him by a police officer. With this information the police went to where Billups lived with his brother, Bernard, and Bernard's wife, Edith.

One of the police officers present at Billups' residence testified at a suppression hearing requested by Billups that when the police arrived at Billups' house they observed two women in front of the house getting into a car. One of the women was Edith Billups, Bernard Billups' wife. She was asked if Billups was at home and she replied that she believed he was. Testimony discloses that at that point Edith Billups turned from the car and proceeded to walk back to the house with the police officers following her. She knocked on the front door and it was opened by Bernard Billups. The officers asked if appellant was home and were told by Bernard Billups that his brother was upstairs sleeping.

The officers then went upstairs and placed Billups under arrest. As the officers were leaving the residence with Billups they noticed a black-and-white tweed-type coat hanging in a hallway just inside the front door.

The police took the coat with them when they took Billups to police headquarters. Cady later identified the coat as that worn by Billups during the robbery and assault.

Bernard Billups denied having given consent but conceded that when he answered the front door his wife, Edith, walked in with the officers right behind her. No one advised the officers to remain out of the house. Based upon the testimony the trial court specifically found that the evidence established that the officers had received consent to enter the house from Mrs. Billups, one of the residents of the house.

With this background we turn now to the assignments of error raised by appellant, the first one being that the trial court erred in refusing to suppress the evidence of the overcoat obtained during the arrest of Billy Billups. Billups' argument is framed in the traditional fourth amendment form. Billups argues that the arrest, having been nonconsensual and without warrant, violated the standards established by the U.S. Supreme Court in *Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980). Appellant then argues that because the arrest was illegal and in violation of Billups' fourth amendment rights, all evidence obtained as a result of the illegal arrest are "the fruits of a poisonous tree" and likewise inadmissible. See *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). Appellant's position is correct unless the trial court properly found that the entry into the Billups home was consensual. While it is true that mere submission to authority is insufficient to establish consent, see, *Amos v. United States*, 255 U.S. 313, 41 S. Ct. 266, 65 L. Ed. 654 (1921), and *Bumper v. North Carolina*, 391 U.S. 543, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968), consent must in each instance be determined from the totality of the circumstances.

While greater expectations of privacy may exist with regard to one's home as opposed to other property, the

issue concerning consent appears to be the same. In *State v. Rathburn*, 195 Neb. 485, 239 N.W.2d 253 (1976), we examined the matter of consent in the context of the fourth amendment to the U.S. Constitution, and said at 489, 239 N.W.2d at 256: "The voluntariness of the consent to search should be determined from the totality of all the circumstances surrounding it. [Citations omitted.] A question of whether a consent to search is voluntarily given is a question of fact."

Likewise, in *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973), the U.S. Supreme Court said in part: "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances. While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent. As with police questioning, two competing concerns must be accommodated in determining the meaning of a 'voluntary' consent—the legitimate need for such searches and the equally important requirement of assuring the absence of coercion."

And in *United States v. Watson*, 423 U.S. 411, 424, 96 S. Ct. 820, 46 L. Ed. 2d 598 (1976), the U.S. Supreme Court said: "We are satisfied in addition that the remaining factors relied upon by the Court of Appeals to invalidate Watson's consent are inadequate to demonstrate that, in the totality of the circumstances, Watson's consent was not his own 'essentially free and unconstrained choice' because his 'will ha[d] been overborne and his capacity for self-determination critically impaired.' [Citation omitted.] There was no overt act or threat of force against Watson proved or claimed. There were no promises made to him and no indication of more subtle forms of coercion that might flaw his judgment. He had been arrested and was in custody, but his consent was given while on

a public street, not in the confines of the police station. Moreover, the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search. Similarly, under *Schneckloth*, the absence of proof that Watson knew he could withhold his consent, though it may be a factor in the overall judgment, is not to be given controlling significance."

And, further, in the recent case of *United States v. Mendenhall*, 446 U.S. 544, 555-58, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980), the U.S. Supreme Court said: "We also reject the argument that the only inference to be drawn from the fact that the respondent acted in a manner so contrary to her self-interest is that she was compelled to answer the agents' questions. It may happen that a person makes statements to law enforcement officials that he later regrets, but the issue in such cases is not whether the statement was self-protective, but rather whether it was made voluntarily.

. . . .

"The question whether the respondent's consent to accompany the agents was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances . . . . The Government's evidence showed that the respondent was not told that she had to go to the office, but was simply asked if she would accompany the officers. There were neither threats nor any show of force. The respondent had been questioned only briefly, and her ticket and identification were returned to her before she was asked to accompany the officers."

The question, therefore, that we must answer in the instant case is whether there was consent given to the officers to enter the Billups home and make the search. In doing so we must keep in mind the standard of review to be applied in such a case, which is, "The applicable standard of review by this court . . . should be the same as applied in other similar types of cases. The

findings of fact by the District Court will not be set aside on appeal to this court unless they are clearly erroneous. In determining whether the District Court's findings are clearly erroneous, this court takes into consideration the advantage of the District Court in having heard the oral evidence." *State v. Van Ackeren*, 194 Neb. 650, 657, 235 N.W.2d 210, 215 (1975). Furthermore, in *State v. Van Ackeren* at 657-58, 235 N.W.2d at 215, we noted: "When the prosecution seeks to justify a warrantless search by proof of voluntary consent it is not limited to proof that the consent was given by the defendant, but may show that the permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected. United States v. Matlock, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 . . . ."

We believe an examination of the record supports the trial court's finding that Edith Billups, a co-occupant of the premises, did in fact consent to the officers entering the home. The evidence clearly establishes that at the time the officers arrived Edith Billups was departing the premises and about to enter into her car and drive away. She voluntarily, without threat or coercion, changed her direction and walked back to the house with the officers knowingly following behind her. She knew the officers were looking for Billups and her action in leading the officers back to the house is completely consistent with the officers' testimony that she was taking them back to the house. Upon arriving at the porch she knocked on the door and, when the door was opened, walked into the house with the officers behind her. She made no effort to indicate to the officers that they were not at liberty to continue following her through the door as they had previously followed her from the sidewalk to the door. Moreover, Edith Billups never appeared and testified to the contrary. We are unable to say that the finding of fact by the trial court to the effect that Edith Billups

gave consent was clearly erroneous and must be disregarded. We therefore must conclude that the trial court's finding of consent was correct, and the first assignment of error must be overruled.

We turn then to the second assignment of error raised by appellant to the effect that the trial court erred in not giving a requested instruction on second degree assault as being a lesser-included offense. We believe that the flaw in this argument is due to the fact that appellant is wrong in maintaining that second degree assault is a lesser-included offense of first degree assault. They are two distinct offenses. Section 28-308(1) provides: "A person commits the offense of assault in the first degree if he intentionally or knowingly causes *serious bodily injury* to another person." (Emphasis supplied.) On the other hand, Neb. Rev. Stat. § 28-309(1) (Reissue 1979) defines assault in the second degree: "A person commits the offense of assault in the second degree if he: (a) Intentionally or knowingly causes *bodily injury* to another person with *a dangerous instrument*; or (b) Recklessly causes serious bodily injury to another person with a dangerous instrument." (Emphasis supplied.) First degree assault occurs whenever "serious bodily injury" is present, while second degree assault only involves "bodily injury" if with a dangerous weapon, and "serious bodily injury" if done recklessly with a dangerous weapon. Certainly there is no evidence in this case to support a claim that the shooting by Billups was done recklessly and was anything but intentional. See Neb. Rev. Stat. § 28-109(19) (Reissue 1979). Therefore, unless we are prepared to say that shooting one in the chest above the heart is not the inflicting of a serious bodily injury and that a jury could lawfully find that shooting one in the chest above the heart is only a bodily injury, there was no evidence upon which assault in the second degree could have properly been submitted to the jury. We have frequently held that it is only when a higher crime fully embraces

all of the ingredients of a lesser offense and when the evidence requires it that an instruction on a lesser-included offense must be given on request. See *State v. McClarity*, 180 Neb. 246, 142 N.W.2d 152 (1966). Neb. Rev. Stat. § 28-109(20) (Reissue 1979) defines serious bodily injury to mean "bodily injury which involves a substantial risk of death, or which involves substantial risk of serious permanent disfigurement, or pro-tracted loss or impairment of the function of any part or organ of the body." The evidence in this case correctly reflected that if the appellant was guilty of anything, he was guilty of intentionally or knowingly causing serious bodily injury to another. While we are not prepared to say, and do not by this decision hold, that every shooting of another is automatically a serious bodily injury, we do believe that shooting one in the chest above the heart in such a manner that the bullet must be dug out and the wound sutured, as disclosed by the evidence, indeed satisfied the statutory definition of "serious bodily injury." To hold anything else would be to totally ignore the obvious. We believe the trial court was correct in only sub-mitting to the jury the issue of first degree assault and refusing to submit to the jury the issue of second degree assault. Having so concluded, the judgment and sentences must be affirmed.

AFFIRMED.