STATE OF NEBRASKA, APPELLEE, V. JOY LANE,
APPELLANT.

317 N.W.2d 750

Filed March 26, 1982.   No. 44096.

Winner, Nichols, Meister, Douglas & Kelly, for appellant.

Paul L. Douglas, Attorney General, and Patrick T. O'Brien, for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

PER CURIAM.

The defendant, Joy Lane, was convicted of distributing cocaine and conspiracy to solicit the sale or distribution of cocaine. She appeals from concurrent sentences to imprisonment for 3 to 5 years on each count.

This case is a companion case to *State v. Lozano,* 209 Neb. 772, 311 N.W.2d 529 (1981). Both this case and *State v. Richter, post* p. 63, 317 N.W.2d 759 (1982), decided today, arose out of an investigation conducted in Scotts Bluff County, Nebraska, in December 1979 and January and February 1980.

On January 29, 1980, the State obtained authority to place a wiretap on the telephone of Delma Lozano. As a result of conversations intercepted through that wiretap, information was obtained which indicated the defendant Lane was involved in the distribution of controlled substances. On February 10, 1980, the State obtained authority to place wiretaps on the residence telephone of the defendant and her husband and on the telephone of the "Auction House" which was owned and operated by the defendant and her husband. Conversations intercepted and recorded as a result of these wiretaps were received in evidence at the trial as a part of the evidence against the defendant.

Motions filed by the defendant to suppress the evi-

dence derived from the February 10, 1980, wiretaps were overruled. Although the defendant has assigned numerous errors, the principal issue upon the appeal is whether the evidence obtained through the wiretaps should have been suppressed.

The application for the wiretaps on the Lane telephones was supported by an affidavit of Robert B. Kinsey, a detective in the Scottsbluff Police Department, dated February 10, 1980; an affidavit of J. G. Robinson, an investigator for the Nebraska State Patrol, dated January 29, 1980; the affidavit of James R. Livingston, chief of police of Scottsbluff, Nebraska, dated January 29, 1980; an affidavit of Robert B. Kinsey, dated January 29, 1980; and an affidavit of Nadine Hopper, dated January 21, 1980. The affidavits dated January 29 and January 21, 1980, were the basis for the original January 29, 1980, wiretap order. The defendant Lane's name was not mentioned in any of these latter affidavits.

The defendant attacks the affidavits on the ground that they did not contain ''a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous,'' as required by Neb. Rev. Stat. § 86-705(1)(c) (Reissue 1976). Subsection (1)(c) requires a separate showing of the *necessity* of a wiretap as a means of investigation of the crime being committed. To demonstrate necessity, the ''prospective and retrospective failure'' of alternative investigative techniques must be apparent from the facts submitted by the applicant. *United States v. Atkins,* 618 F.2d 366 (5th Cir. 1980). The issue is whether the February 10, 1980, application for authority to tap the Lane telephones, supported by the accompanying affidavits, adequately demonstrated the *necessity* of using a tap on the Lane telephones to investigate her involvement in drug distribution.

The Kinsey affidavit dated February 10, 1980, sum-

marizes numerous intercepted conversations to which the defendant was a party, or in which others who referred to the defendant were parties, and analyzes these conversations, coming to the conclusion that the conversations contained "drug jargon." The affidavit does not set out any information from which the court could find that alternative investigative techniques would be unlikely to succeed if tried with respect to the defendant Lane.

The affidavit of State Patrol Investigator Robinson concerned itself mainly with a showing of probable cause as to the four original suspects at whom the January 29, 1980, application was directed. On the issue of necessity, Robinson's affidavit stated only that, based on his 6 years' experience as a State Patrol drug investigator, "it has been [my] experience that drug dealers regularly use the telephone in the normal course of their illegal dealings." No mention of the defendant Lane was made in Robinson's affidavit.

The affidavit of Scottsbluff Police Chief Livingston first noted that "during the past twelve years, conventional and traditional law enforcement tactics and techniques directed against violations of Nebraska statutes and city ordinances allegedly occurring in a small section of Scottsbluff commonly known as East Ninth Street have been unsuccessful." Livingston's affidavit then detailed the nature of these violations, which included drug sales and possession, and stated that this information had been gleaned from "reliable and confidential sources of information," including not only paid police informers but neighbors and other noncriminal citizens, and also from surveillance. Livingston also noted: "Officers . . . are handicapped in conducting investigations due to instant recognition of personnel and equipment by the residents in the East Ninth Street area." Finally, he stated "that a variety of investigative techniques have been used

and exhausted in an effort to penetrate the groups. It has been revealed, according to affiant, that for the most part, victims of the crimes of drug sales, prostitution and gambling and occasionally robbery by prostitutes are generally reluctant to report these activities and when information is received which is of value, the sources demand that they remain anonymous . . . . [M]any covert and undercover operations have been attempted in order to gather evidence sufficient for prosecution and conviction of the individuals involved. Of the many operations attempted, only a few have been successful because of the tremendous amount of suspicion generated towards individuals not known to the permanent residents who are engaged in the illegal activities.''

The Kinsey affidavit of January 29, 1980, detailed the history of the investigation of the ''East 9th Street'' area of Scottsbluff, with a description of other investigative tactics and techniques in the 9th Street area, including surveillance and attempts to infiltrate the criminal group working out of that area. Kinsey noted that detectives from Wyoming attempted ''to infiltrate the criminal activities that are believed to occur at Bruces Tavern [in] Scottsbluff. The two Detectives were unsuccessful because it appeared that the people at Bruces Tavern 'made' them as police officers.'' Kinsey further stated that successful infiltration of this group ''appears unlikely . . . because these people are not generally known to be involved in drug transactions with people that are not specifically known to them. The suspects are Black or Hispanic and there are presently no Mexican-American or Black officers available as undercover officers in the State of Nebraska for use by the Scottsbluff Police Department.''

Kinsey also noted the reluctance of victims of crimes perpetrated in this area to discuss them with police ''because they would be making admissions

that they took part in illegal activities." Finally, Kinsey stated: "The relationships between Dorothy Jones, Yvonne Sabala, Delma Lozano and Bruce Matlock Jr. spans many years and generations. It is unlikely that an undercover agent could ever be introduced into this group, because of these close and long relationships. It is your affiants opinion that one would most likely have to be a member of one of the families involved or a prostitute working for them in order to be accepted into the group." Defendant Lane's name was not mentioned anywhere in these four affidavits.

The Nadine Hopper affidavit detailed various criminal transactions involving the four suspects which the January 29, 1980, affidavit related to, but contained no information relating to the defendant in this case.

We have stated: "While . . . neither specific nor all possible investigative techniques must be tried before orders for wiretaps can be issued nor is the government required to use a wiretap only as a last resort; nevertheless, the wiretap procedures cannot be routinely employed as an initial step in criminal investigation." *State v. DiMauro and Kessler,* 205 Neb. 275, 282, 287 N.W.2d 74, 77-78 (1980). This is true whether the wiretap sought is the first one covering a particular criminal activity, or whether a previous tap has furnished information which is the basis for the application for another tap. In the *DiMauro* case, Omaha police first sought and obtained an order to tap the telephone of Rose Trader. We held that the application and showing upon which the order to tap the Trader telephone was based demonstrated the necessity of a wiretap sufficiently. *State v. Trader,* 205 Neb. 282, 287 N.W.2d 78 (1980). The tap on Trader's phone led officials to DiMauro, and they immediately sought a tap on DiMauro's phone, without considering further investigative procedures against DiMauro. "[T]he

State's witness conceded that no other investigative procedure was attempted and all the police sought to do was obtain the wiretap." *State v. DiMauro and Kessler, supra* at 277, 287 N.W.2d at 75. In *DiMauro* we found that the affidavit filed with regard to the necessity of a tap on DiMauro's telephone was insufficient to make the necessary showing: "The affidavit filed by the State in this case upon which the DiMauro wiretap was authorized recited in part that 'while normal police investigative procedures might provide enough evidence to arrest Ross J. Diamauro [sic] for illegal gambling, normal investigative procedures have been attempted in the past by members of the Omaha . . . Police Division . . . to obtain enough evidence to apprehand [sic] or at least identify the other parties involved in this illegal gambling operation being conducted by Ross J. DiMauro, and these methods have failed and are most likely to fail in the future.' " *Id.* at 277, 287 N.W.2d at 75.

In the present case, the contents of the affidavits with regard to alternative investigative procedures which had been tried and failed or were likely to fail if tried were more detailed than the showing disapproved in *DiMauro,* but a sufficient showing was not made as to the futility of alternative investigative procedures as to the defendant Lane. While the showing which must be made has been described as "insignificant and the burden . . . impose[d on the government] de minimus [sic]," Carr, The Law of Electronic Surveillance § 4.05[4] at 179 (1977), still the showing must be made that the requested wiretap is not being " ' "routinely employed as the initial step in criminal investigation." ' " *State v. DiMauro and Kessler, supra* at 279, 287 N.W.2d at 76 (1980); *United States v. Baker,* 589 F.2d 1008 (9th Cir. 1979); *United States v. Santora,* 583 F.2d 453 (9th Cir. 1978). In *United States v. Scibelli,* 549 F.2d 222 (1st Cir. 1977), the U.S. Court of Appeals for the First Circuit

has noted that, as to an application for a second wiretap based in part on information gleaned from a first tap: "[I]ncorporation of the [first] affidavit . . . in the latter two applications went a long way towards meeting the requirement [of a showing of necessity]." 549 F.2d at 228. However, the court went on to state that "each of the two subsequent applications alleges sufficient *additional facts showing the continuing failure of normal investigative procedures.*" (Emphasis supplied). *Id.* at 228. In *Scibelli,* the second application applied for taps on four phones other than those applied for in the first application. With regard to the standard for determining the propriety of the district court's authorization of the tap, the First Circuit noted: "An appeals court's role is not to make a *de novo* determination of sufficiency as if it were a district judge, but to decide if the facts set forth in the application were minimally adequate to support the determination that was made." *Id.* at 226.

In the present case, the February 10, 1980, application and affidavit of Kinsey stated no "additional facts showing the continuing failure of normal investigative procedures." All the facts dealing with the failure of normal investigative procedures were incorporated verbatim from the January 29, 1980, affidavits. In *United States v. Baker, supra* at 1012, the court noted: "[A] showing that two or more principals are involved in one conspiracy as to one of which a sufficient affidavit has been filed is not alone sufficient to support an application as to all of the alleged principals or their telephones."

The courts agree that the necessity-showing requirement "must be reviewed in a 'practical and common sense fashion.'" *United States v. Armocida,* 515 F.2d 29, 37 (3d Cir. 1975), *cert. denied* 423 U.S. 858, 96 S. Ct. 111, 46 L. Ed. 2d 84; *United States v. Atkins,* 618 F.2d 366 (5th Cir. 1980); *United States v. Feldman,* 535 F.2d 1175 (9th Cir. 1976);

*United States v. Jackson,* 549 F.2d 517 (8th Cir. 1977). However, "the validity of the application for the wiretap authorization and for the order of the authorizing judge cannot be established through the exercise of hindsight. The application and the order must be viewed in the light of circumstances as they existed and were known or reasonably anticipated at the time and cannot be 'bootstrapped' by what the wiretap later uncovered." *United States v. Curreri,* 388 F. Supp. 607, 621 (D. Md. 1974).

The January 29, 1980, affidavits did not establish the futility of alternative investigative procedures as to the defendant Lane. The showing of necessity in the January 29, 1980, affidavits focused on the inability of investigators to infiltrate and do business with the "East 9th Street" group because of their suspicion of those not known to the group for a long time. Part of the reason for the lack of success in infiltration revolved around the fact that "the suspects are Black or Hispanic and there are presently no Mexican-American or Black officers available as undercover officers in the State of Nebraska for use by the Scottsbluff Police Department." This was one of the elements cited in *State v. Lozano,* 209 Neb. 772, 311 N.W.2d 529 (1981), as strengthening the showing of necessity there. The defendant Lane is Caucasian.

The January 29, 1980, affidavits demonstrated the futility of physical surveillance of the suspects' homes, since "[o]fficers . . . are handicapped in conducting investigations due to instant recognition of personnel and equipment by the residents in the East Ninth Street area." The defendant Lane did not live on East 9th Street in Scottsbluff, nor did she live in Scottsbluff at all. Her home and business were both in the neighboring community of Gering. The futility of physical surveillance of the defendant Lane's residence or business was not established by incorporation of the January 29, 1980, affidavits' ref-

erences to unsuccessful physical surveillance.

The transcripts of the telephone calls intercepted through the Lozano tap, and the analysis of these calls in the February 10, 1980, affidavit of Kinsey, did tend to demonstrate that defendant Lane's part in the drug trading was at a slightly higher level than that of the four persons named in the January 29, 1980, order. But there was nothing in the incorporated affidavits, or in Kinsey's February 10, 1980, affidavit, which would indicate to the trial court that this difference in the part played by Lane would not respond to investigative techniques other than a wiretap. While certain statements with reference to the defendant Lane's family and her position in the community of Gering did appear in an addendum to the application of February 13, 1980, to tap the defendant Richter's telephone, see *State v. Richter, post* p. 63, 317 N.W.2d 759 (1982), which statements could have strengthened the showing of necessity as to the defendant Lane, these statements did not appear in the February 10, 1980, application or affidavits.

The trial court must make its finding of necessity "on the basis of the facts submitted by the applicant." § 86-705(3). The officers who intercepted the conversations set out in the February 10, 1980, Kinsey affidavit all admitted that they had considered no other investigative techniques with regard to the defendant Lane, but upon discovering her involvement immediately applied for a tap on her telephone.

We conclude that the showing made in support of the February 10, 1980, application failed to satisfy the statutory requirement of necessity for the wiretap on the Lane telephones. The failure to sustain the motions to suppress was prejudicial error which requires that the judgment be reversed.

It is unnecessary to consider the other assignments of error.

The judgment of the District Court is reversed and the cause remanded for a new trial.

REVERSED AND REMANDED.

BRODKEY, J., not participating in decision.

CAPORALE, J., participating on briefs.

CLINTON, J., dissenting.

For reasons hereafter stated, I dissent. The purposes of Neb. Rev. Stat. §§ 86-705(1)(c) and 86-705(3)(c) (Reissue 1976) are designed only to insure that wiretapping is not routinely employed as the initial step in a criminal investigation. *State v. DiMauro and Kessler,* 205 Neb. 275, 287 N.W.2d 74 (1980). These sections of the statute do not require the exhaustion of all other possible or reasonable avenues of investigation. They do not in fact require that other methods even be tried if the application demonstrates other procedures are *unlikely to succeed* or are too dangerous. Their requirements are alternative. Other methods must have been tried and failed "or" the second alternative must be demonstrated. *State v. Kolosseus,* 198 Neb. 404, 253 N.W.2d 157 (1977).

The majority opinion concludes that the application in this case is insufficient because it was routinely employed as the initial step in the criminal investigation. I dissent because I believe a careful examination of the application sufficiently demonstrates that methods other than wiretap are unlikely to succeed.

As the facts of the application described in the majority opinion demonstrate, and as our opinion in *State v. Lozano,* 209 Neb. 772, 311 N.W.2d 529 (1981), shows, the law enforcement officials were engaged in the investigation of a conspiracy to acquire, sell, and distribute controlled substances involving Lozano and certain other named individuals, as well as certain persons *whose names were unknown.* The application in *Lozano* includes supporting affidavits and exhibits outlining the long history of the failure

of investigative methods other than wiretap. These included information from confidential informants, searches of the Lozano residence, telephone toll records, surveillance, attempts to purchase drugs by undercover officers, information indicating a close-knit network of relatives, friends, and longtime associates, and a refusal to deal with persons unknown to the conspirators. We found the application sufficient in *Lozano*.

An authorized tap on the Lozano telephone disclosed, through several intercepted conversations, that Joy Lane, a party to the intercepted conversation, was a participant in the conspiracy. The proper legal authorities then filed an application for a tap on the Lane telephone, which the District Court found sufficient, and the tap was authorized.

The initial wiretap involving the Lozano telephone was obtained on January 29, 1980; the tap on the Lane telephone was secured on February 10, 1980; and the tap on the Richter telephone (case No. 44097), on February 13, 1980. These individuals were arrested on February 21, 1980.

The application in this case incorporated all of the information in the Lozano application and, in addition thereto, the contents of the conversations between Lozano and Lane which had been intercepted pursuant to the authorized tap on the Lozano telephone which we had found to be lawful. The supporting affidavits conclude that there is an ongoing conspiracy and that Joy Lane is a supplier of drugs to Lozano.

The information in the application, including toll call records, indicates that the conspiracy is a widespread one involving connections in Salt Lake City, the State of Florida, and many other towns and cities throughout the United States, including several cities in Nebraska.

The application and the supporting affidavits indicate very clearly that Joy Lane was a part of the on-

going conspiracy and that crimes were in progress. In addition to the above, the judge would be entitled to make the following inferences from the facts set forth: (1) Joy Lane was at least as cautious as the other conspirators as to whom investigative methods other than wiretap had been unsuccessful. (2) Joy Lane's part in the conspiracy is conducted almost wholly, if not entirely, by telephone communications. (3) The only way in which the investigating officers were *likely* to get information which would enable them to act in a timely manner in obtaining search and arrest warrants would be by interception of telephone communications from or to Joy Lane.

The majority opinion relies to a large extent upon *United States v. Santora,* 583 F.2d 453 (9th Cir. 1978). *Santora* has been criticized by one of the text writers in the following language: "The court may have been too demanding. It might require a several-week hiatus between the expiration of the first-generation warrant and the completion of the normal investigation into the targets of the second-generation warrants. To insist upon such an investigation might permit crimes to go undetected (particularly if the first-generation tap revealed that the second-generation targets were about to attempt a major criminal transaction) or render the probable cause for the second-generation warrant, which is provided by the first-generation warrant, stale.

"Law enforcement officials should begin to investigate potential second-generation targets as soon as they have been identified. The second-generation application should detail the efforts which have been made and explain why the results are unsatisfactory. The application should then stress the length and complexity of the investigation which preceded the first-generation warrant, explain the importance of the second-generation warrant to the original (or expanded) goals of the investigation, explain why extensive use of ordinary procedures might alert the

targets to the existence of the initial warrant or destroy the effectiveness of the new warrant in advance of its being obtained, and emphasize the need to act quickly lest important opportunities be lost." Fishman, Wiretapping and Eavesdropping § 188 at 110 (Cum. Supp. 1981).

The *Santora* precedent does not, of course, bind this court. There are other precedents which we are free to follow and which I believe we should follow. In *United States v. Williams,* 580 F.2d 578 (D.C. Cir. 1978), the U.S. Court of Appeals, District of Columbia Circuit, was confronted with a situation similar to that which we have before us and involved what Professor Fishman referred to as second-generation applications. In that case the first-generation application, referred to as the Seventh Street investigation, set forth the long history of the investigation by ordinary methods, all of which were unsuccessful. The conclusion of that application was: " '[d]ue to the considerable length of time covered by this investigation using all possible normal investigative techniques, and through the experience of affiant and other Special Agents of the Federal Bureau of Investigation familiar with the investigation of numbers gambling operations, it is reasonably concluded [that] the continued use of normal investigative techniques would not bring this matter to a successful conclusion.'

"The Landover application, which was made after . completion of the Seventh Street interceptions, incorporates the earlier affidavit and similarly details reasons for the Government's belief that the target telephones were being used in a gambling operation. The Landover affidavit also includes transcripts of calls intercepted on the Seventh Street line from the target telephones, and a concluding section similar to that in the Seventh Street affidavit.

"Appellants argue that the summary and prayer portions of the affidavits contain mere boilerplate

assertions, in derogation of the statutory command. To be sure, these sections of the affidavits are framed in conclusory terminology, but they cannot rationally be separated from the preceding detailed descriptions of the investigative events. Applications are not to be read in a piecemeal fashion, and viewed as a whole the requests here delineated the reasons—which we deem ample—why other investigative techniques either had failed or would not be feasible. The Government had conducted a multifaceted five-year investigation and still was unable to secure the evidence necessary to prosecute many of the principals of the gambling operation. This, then, is not a situation in which the Government sought to employ wiretapping as a routine investigative tool; neither is it a case in which the Government relied simply on 'the insufficiency of alternative procedures in gambling prosecutions *in general* . . . .' Instead, after scrutinizing the numbers activity over a long period of time by conventional techniques, the Government not unreasonably believed it needed to utilize electronic surveillance to gain enough intelligence about the 'nature and the scope' of the operation. In short, 'exposure of [the] entire operation required different and more sophisticated techniques.' The applications adequately set forth the basis for concluding that normal investigative procedures had been exhausted or would be unlikely to produce essential evidence, and the District Court correctly held that the statutory requirement had been satisfied." *Williams* at 589-90.

In *United States v. Baker,* 589 F.2d 1008 (9th Cir. 1979), a similar situation existed. The court said: "The Jones affidavit, in addition to individually directed details, does allege circumstances pertaining to all of the tapped telephones and the putative participants that meet the tests laid down by this court. These included a factual showing of due consideration of the possibilities of infiltration, the infeasi-

bility of locating gambling records, the reluctance of informants to testify in court, the probable unproductiveness of investigation through grand jury proceedings, the conducting of numerous physical surveillances of all of the principals listed in the affidavit, including Judd, and the discovery that they were particularly wary of surveillance. These general allegations were particularized by specific examples of difficulties and obstructions encountered in the process.

"It is true that Judd's situation unlike that of other suspects was not covered by specific examples of unsuccessful physical surveillance or infiltration. Yet we believe that the Jones affidavit read as a whole reasonably established as to Judd, as well as to the others named, that other or additional investigative procedures short of electronic surveillance if further pursued would be unlikely to succeed. Government investigators, subject to evaluation by the courts on similar bases, are entitled to use reason and common sense in the performance and documentation of their investigations to support applications for wiretaps. The statute does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope. Upon the showing made, the district court could reasonably conclude, and did so, that alternative means of investigation had failed or likely would be unsuccessful as to Judd." *Baker* at 1012-13.

In *Cuba v. State,* 362 So. 2d 29 (Fla. App. 1978), the District Court of Appeals of Florida, after making reference to the statutory requirement, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to suc-

ceed if tried or to be too dangerous," said at 32: "The purpose of that requirement as stated by the Supreme Court of the United States with reference to a similar provision in the Federal statute, is 'to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.' *United States v. Kahn,* 415 U.S. 143, 94 S. Ct. 977, 39 L. Ed. 2d 225 (1974). Also, it is held in federal decisions that it is not the purpose of that requirement that electronic surveillance must be foreclosed until every other imaginable method of investigation has been unsuccessfully attempted, 'but simply to inform the issuing judge of the difficulties involved in the use of conventional techniques'. *United States v. Pacheco,* 489 F.2d 554, 565 (5th Cir. 1974); *United States v. Alfonso,* 552 F.2d 605, 611 (5th Cir. 1977). It is common knowledge, derived from experience, that conventional investigative techniques generally are insufficient for adequate and successful prosecutorial termination of such criminal lottery activites. See: *United States v. Abramson,* 553 F.2d 1164, 1171 (8th Cir. 1977)."

We ought not examine the trial court's conclusions de novo. On review, an appellate court does not reexamine de novo whether alternatives might have sufficed; rather, the reviewing court's role is to decide if the facts set forth in the application were minimally adequate to support the determination that was made. *United States v. Scibelli,* 549 F.2d 222 (1st Cir. 1976), *cert. denied* 431 U.S. 960, 97 S. Ct. 2687, 53 L. Ed. 2d 278 (1977). The requirements of § 86-705(3)(c) are insignificant and the burden imposed thereby is de minimis. *United States v. James,* 494 F.2d 1007 (D.C. Cir. 1974).

Adherence to the too demanding requirements set forth in the majority opinion will, without question, greatly hinder if not render impossible the apprehension and conviction of many persons engaged in

a widespread drug conspiracy. It also results in this obviously guilty defendant being freed.

I would affirm the conviction.

BOSLAUGH and HASTINGS, JJ., join in this dissent.