STATE OF NEBRASKA, APPELLEE, V. PAUL KARL GOLTER, APPELLANT.

342 N.W.2d 650

Filed December 23, 1983. No. 82-646.

Richard J. Bruckner, for appellant.

Paul L. Douglas, Attorney General, and Patrick T. O'Brien, for appellee.

KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ.

SHANAHAN, J.

Paul Karl Golter was charged with conspiracy to deliver a controlled substance. Neb. Rev. Stat. § 28-202(1)(a) and (b) (Reissue 1979); § 28-416(2)(a) (Cum. Supp. 1982); § 28-405 sch. II(a)(4) (Cum. Supp. 1982); § 28-401(16)(a) and (c) (Cum. Supp. 1982). Golter's motion to suppress evidence obtained by the State of Nebraska as a result of a wiretap of Golter's residential telephone was overruled.

After a trial to the court and a conviction of the crime alleged, Golter appeals to this court. We reverse and remand for a new trial with directions.

On November 11, 1981, the county attorney of Antelope County, Nebraska, applied to the district court for an order authorizing a wiretap of the residential telephone of Paul Karl Golter of Antelope County, Nebraska. Attached to the county attorney's application was an affidavit of Manuel S. Gallardo, a drug investigator for the Nebraska State Patrol. That affidavit was also dated November 11, 1981. Gallardo's affidavit contained several allegations in support of the application for the wiretap. A criminal investigator for the State Patrol attempted to purchase ½ ounce of cocaine from Golter on December 6, 1980. In the investigator's car parked outside a tavern, Golter delivered ½ ounce of cocaine to the investigator, who paid Golter $1,125 for the delivery. At this meeting Golter mentioned he could deliver two kinds of cocaine. In the car Golter produced a vial of cocaine and proceeded to "snort" some. Golter then handed the vial of cocaine to the investigator, who simulated "snorting the cocaine." The investigator's refusal to "snort the cocaine" bothered Golter. Golter gave the $1,125 back to the investigator, who later returned the cocaine to Golter. After several contacts the investigator failed to make arrangements for a "deal" with Golter. The investigator's subsequent attempts to contact Golter were unsuccessful because Golter did not return the investigator's telephone calls. A second undercover purchase would create suspicion, according to the affidavit. The affidavit continued by reciting that Alan Golter, a relative of Paul Golter, was the subject of an investigation from October 7 to October 10, 1981, regarding the sale of marijuana, but there is no reference to participation by Paul Golter. Alan Golter, on October 8, 1981, detected an aerial surveillance by the State Patrol. (The exact site under aerial surveillance is not specified in the affidavit.)

William K. Golter, a brother of Paul Golter, was arrested for the sale of hashish and marijuana on December 13, 1973. Local police conducted a visual surveillance of a bar in Osmond, Nebraska, sometime in November and December 1980. An investigator of the State Patrol received information "from an ordinary, concerned citizen" that Paul Golter goes "to [the bar] in Osmond . . . and meets with [a named individual]" who has been observed by the Osmond Police Department "rolling or packaging marijuana on the bar" of the establishment in Osmond. (There is neither an allegation of a date for such occurrence(s) nor an allegation that Golter was present when such event(s) occurred.) A concerned citizen-informant observed one Robert Whitmer of La Puente, California, at the Golter ranch on January 15, 1981, but Whitmer's record did not reveal any drug conviction or drug-related activity. A subpoena of Golter's telephone records revealed that there were several telephone calls from September 1, 1980, to August 15, 1981, to individuals who had criminal records including convictions of drug-related offenses. Sometime after October 3, 1981, Gallardo interviewed an informant who related that drugs "are flown in to the Paul Golter ranch" and that the informant had "observed packages dropped out of an airplane over Paul Golter's ranch." (The affidavit does not specify the date of this observation by the informant.) Law enforcement officers had investigated Golter and his "associates" for 10 years. Gallardo was personally involved in the "investigative effort aimed at Paul Golter since September 8, 1978." Attempts were made but failed to directly involve Golter in a "controlled transaction." The investigator for the State Patrol failed "to make a case on account of Golter's paranoia and precautions." "Golter's residence is located in the country northwest of Orchard. This residence has no public access roads that affiant can use to get close to the residence without being seen. . . . Because there is

very little traffic, and what traffic there is is of a local nature and known to [Golter] and his friends, ground surveillance of the residence will not be possible. Were surveillance possible, it might produce information about the registered owners of vehicles, and the shape and size of parcels, but it is unlikely to produce, and in the collection experience of peace officers, has failed to produce information concerning arrangements for delivery of controlled substances, the time and place of their arrival, the location in which substances are kept, and the identities of those involved in the network. . . . Based on this accumulated training and experience, affiant is of the opinion that investigative techniques other than interception of wire communications have not been, and will not be, successful or if tried reasonably, appear dangerous and that interception of wire communications is necessary to attain the objectives of the investigation."

Relying solely on the preceding affidavit of Gallardo, on November 11, 1981, the district court authorized a wiretap of Golter's telephone for a period of 30 days. Pursuant to the order of November 11, there was a wiretap of Golter's telephone. On December 11, 1981, an application for an extension of the Golter wiretap was filed. A copy of Gallardo's affidavit of November 11 was attached to the application of December 11. The application of December 11 incorporated by reference the contents of Gallardo's affidavit dated November 11, 1981. On December 11 the trial court authorized an extension of the Golter wiretap for an additional 30 days.

Golter questioned the validity of the court's order authorizing the wiretap and filed a motion to suppress information obtained by the wiretap. At the hearing on the motion to suppress, Vernon Hickson, sheriff of Antelope County for 15 years, testified that he could conduct a visual surveillance of Golter's property and that there would not have been any problem regarding such visual surveillance. Hick-

son was well acquainted with the ranch area of Golter's residence and described the area as hilly, with many trees. In his deposition offered at this hearing on the motion to suppress, Gallardo acknowledged there was no reason for the absence of surveillance regarding Golter except the reasons stated in the affidavit of November 11, 1981. The motion to suppress was overruled. At a subsequent trial the State produced evidence attributable to information obtained through the wiretap. Golter was convicted as charged and appeals to this court.

The validity of the order authorizing a wiretap of Golter's telephone rests upon Neb. Rev. Stat. § 86-705(1)(c) (Reissue 1981), namely, that the application for the wiretap "shall include the following information: . . . (c) A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous"; and, further, upon the determination by the district court that a wiretap was necessary under the circumstances, in accordance with § 86-705(3)(c).

In *State v. Kolosseus*, 198 Neb. 404, 253 N.W.2d 157 (1977), we set out the background of Neb. Rev. Stat. §§ 86-701 et seq. (Reissue 1981), the Nebraska "wiretap" law, and its federal counterpart, 18 U.S.C. §§ 2510 et seq. (1976). In reference to the federal "wiretap" law, the U.S. Supreme Court in *United States v. Giordano*, 416 U.S. 505, 527, 94 S. Ct. 1820, 40 L. Ed. 2d 341 (1974), stated: "The words 'unlawfully intercepted' are themselves not limited to constitutional violations, and we think Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device." We make similar observations about the Nebraska

"wiretap" law, §§ 86-701 et seq., as have been made by the U.S. Supreme Court in *Giordano* regarding the federal law. A wiretap can be authorized only after there has been fulfillment of the specific requirements imposed by the Nebraska wiretap law. The standards imposed by state law may be more restrictive than federal law, but cannot be less restrictive. For this reason the requirements for a wiretap under state law may exceed constitutional mandates or minimums. See, J. Carr, The Law of Electronic Surveillance, *The Enactment and Constitutionality of Title III* at 21-50 (1977); C. Fishman, Wiretapping and Eavesdropping § 5 (1978). The bedrock of our wiretap law is stringent judicial monitoring of law enforcement agencies seeking to use and using electronic surveillance—an investigative technique highly intrusive upon the privacy of the citizenry.

In *State v. Kolosseus, supra,* we held that § 86-705(1)(c) "does not require the exhaustion of all other possible or reasonable avenues of investigation. It does not, in fact, require that other methods even be tried if the application demonstrates other procedures are unlikely to succeed or are too dangerous. The requirements are alternative, that is, other methods must have been tried and failed 'or' the second alternative must be demonstrated. . . . 'Investigators are not obliged to try all theoretically possible approaches. It is sufficient that the government show that other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation. The government must, however, *fully explain* to the authorizing judge the *basis* for such a conclusion.' . . . We conclude that what is required under the first alternative is that the application make a *full and complete disclosure of all that has been done* so that the court may make a judgment as to whether more should be required before a tap is authorized." (Emphasis supplied.) *Id.* at 414-15,

253 N.W.2d at 163. See, also, *United States v. Vento*, 533 F.2d 838 (3d Cir. 1976).

Section 86-705(1)(c) does contain a "necessity" requirement in order to limit the use of wiretaps with their intrusive nature and to assure that wiretapping is not utilized in situations where traditional investigative techniques would suffice to expose the crime. See, *United States v. Kahn*, 415 U.S. 143, 94 S. Ct. 977, 39 L. Ed. 2d 225 (1974); *United States v. Bailey*, 607 F.2d 237 (9th Cir. 1979). The purpose of the necessity requirement, i.e., the "full and complete statement," is not to foreclose a wiretap until every conceivable investigative technique has been exhausted. Rather, the full and complete statement informs a court of the nature and progress of the investigation, explains the difficulties involved in normal investigative techniques, and assures that a wiretap is not obtained where conventional investigative techniques would be sufficient to expose a crime. *United States v. Lanza*, 341 F. Supp. 405 (1972); *United States v. Fury*, 554 F.2d 522 (2d Cir. 1977). Law enforcement agencies must provide the court with sufficient information by which the court can exercise the independent judicial determination required under the Nebraska wiretap law. See *United States v. Fury, supra*. The full and complete statement must include a factual basis "as to *why* normal investigative procedures are not being used." (Emphasis supplied.) *United States v. Bobo*, 477 F.2d 974, 981 (4th Cir. 1973). Affidavits in support of an application for a wiretap must contain a statement demonstrating (1) that other investigative procedures have been tried but have failed or (2) that other investigative procedures reasonably appear to be unlikely to succeed, if tried, or reasonably appear to be too dangerous. *State v. Lane*, 211 Neb. 46, 317 N.W.2d 750 (1982).

The "statement" required by § 86-705(1)(c) is a statement of fact. A recital regarding the difficulties of gathering usable evidence is not a sufficient

basis for a wiretap order. *United States v. Kerrigan*, 514 F.2d 35 (9th Cir. 1975). An application whose bases are general declarations and conclusory statements of affiants will not support authorization for a wiretap. See *United States v. Vento, supra.* A wiretap cannot be authorized on the factually unsupported assertion that general police experience indicates that ordinary investigative techniques are unlikely to succeed, if tried, or that such techniques appear to be dangerous. See *United States v. Spagnuolo*, 549 F.2d 705 (9th Cir. 1977). Where the application for a wiretap is silent regarding the status of investigation or where general conclusory statements are substituted for specific facts, the district court is not informed of the investigation by a law enforcement agency. An affidavit reciting conclusions unsupported by particular facts is no basis for a court's determination that there has been compliance with the statute governing issuance of a wiretap order. See, *Wilson v. State*, 377 So. 2d 237 (Fla. App. 1979); *United States v. Spagnuolo, supra.*

The affidavit in the present case states there can be no visual surveillance from automobiles driven along the road near Golter's residence. Beyond such reference to visual surveillance from automobiles, the affidavit contains no facts describing the existence, failure, or perils of visual surveillance of the Golter residence. See *State v. Kolosseus*, 198 Neb. 404, 253 N.W.2d 157 (1977). In essence, the balance of the affidavit regarding visual surveillance recites hypothesis and not history. It is reasonably inferable from the affidavit that visual surveillance is possible and practical under the circumstances. However, the affiant predicts that the quantity or quality of information obtainable through visual surveillance probably would not establish the elements of the crime alleged. Such investigative augury hardly reaches the stature of a statement of fact demonstrating exhaustion or unavailability of normal or conventional investigative techniques.

Golter's residence was the focal point of the investigation. The possibility and practicality of visual surveillance of Golter's residence is borne out by Sheriff Hickson. The affidavit in this case fails to negative the possibility and practicality of visual surveillance. See *State v. Lane, supra*. If factually unsupported and conclusory statements in an affidavit can supply the requirement of necessity for a wiretap, then it is the law enforcement agency, not a court, which determines when a wiretap is a necessary ingredient of an investigation. A court's relinquishing responsibility under the wiretap statutes and law enforcement's usurpation of judicial function will produce, as expressed in the words of Alexander Pope, a vice which our system will "first endure, then pity, then embrace." Good law enforcement requires enforcement of the law—even to the point that a law enforcement agency must obey the statute governing its investigations.

For the reasons stated the trial court did not have sufficient factual information with the application, as prescribed by § 86-705(1)(c), for an informed decision required under § 86-705(3)(c). The wiretap was therefore improperly authorized and the communications sought to be suppressed by the motion were "unlawfully intercepted" within the meaning of § 86-705(11). The motion to suppress should have been sustained.

Concerning Golter's claim of error regarding the sufficiency of evidence of a conspiracy, our holding in this case makes it unnecessary to consider such assignment of error.

All evidence gathered through electronic surveillance pursuant to the order of November 11, 1981, and its extension of December 11, 1981, shall not be admitted in subsequent proceedings. In view of the admission of evidence at trial, that is, evidence obtained in violation of § 86-705, the conviction of Paul Karl Golter is set aside, the judgment of the district court in these proceedings is reversed, and the cause

is remanded to the district court for a new trial consistent with our opinion in this case.

REVERSED AND REMANDED FOR A NEW TRIAL WITH DIRECTIONS.

McCOWN, J., not participating.

HASTINGS, J., dissenting.

The affidavit which the majority holds to be insufficient to support a wiretap order contains two important groups of facts.

First, it is apparent that as a result of subpoenas served on the telephone company, a record of long-distance calls charged to the defendant's number from September 1, 1980, to August 15, 1981, revealed that a number of highly suspicious calls were placed.

Six calls were made to a party in California who had a criminal record consisting of carrying a concealed weapon and trespassing; 5 calls to an O'Neill number, whose subscriber purchased $600 worth of cocaine from a go-between of the defendant, and who also was an associate of a pimp and drug dealer in South Dakota; 5 calls to a Brunswick, Nebraska, number, whose subscriber was involved in dealing in 80-pound marijuana sales, hashish, and cocaine amounting to $100,000 in a 2½-month period; 1 call to a Creighton, Nebraska, number to a subscriber who had been engaged in illicit drug operations; 42 calls to an Osmond, Nebraska, number, the subscriber of which, according to a reliable informant, was involved in the distribution of narcotics with the defendant; 12 calls to 5 South Dakota numbers, the subscribers of which, according to a reliable informant, were involved in the distribution of narcotics with the defendant, or were involved in narcotics in South Dakota, or owned a particular airplane which was observed by an ordinary citizen landing on a nearby airstrip and regularly met with the defendant; and 4 calls to a Yankton, South Dakota, number listed to a person who was a pilot of the airplane mentioned above, which was observed

on a particular day landing on an airstrip on which the defendant's pickup truck was parked. On one occasion this truck was backed up to the aircraft and a concerned citizen noticed articles being exchanged between the truck and the pickup, and as the citizen approached, the airplane took off before the second engine had been fully powered.

Additionally, 17 calls were made to a Baldwin Park, California, number to a subscriber who was an associate of the defendant and was suspected of being involved in drug dealings with the defendant; 1 call to a Plainview, Nebraska, number to a subscriber who the same informer previously mentioned said sold drugs obtained from the defendant; 13 various calls to 4 numbers in Texas, California, and Nebraska to subscribers, all of whom had records involving drugs and drug distribution.

The facts recited in the affidavit mentioned in the majority opinion are that the defendant's residence is located in a rural area near Orchard, Nebraska; that such residence has no public access roads that the affiant can get close to; that there is very little traffic, and what there is is of a local nature known to the defendant and his friends. It is true that the affiant then concludes that, because of those facts, ground surveillance of the defendant's residence would not be possible.

Even throwing out the affiant's conclusion, which we must, it seems apparent that there are facts from which a magistrate could reach the conclusion that the affiant did. Even though a local sheriff testified to the contrary, it was a factual issue which had evidence to support either conclusion. The applicable standard of review is that the findings of fact made by the district court will not be set aside on appeal to this court unless they are clearly erroneous. *State v. Billups*, 209 Neb. 737, 311 N.W.2d 512 (1981).

Finally, it is extremely doubtful that surveillance would disclose any pertinent facts other than those

known to law enforcement agencies and which were mentioned in the majority opinion.

I would affirm the judgment of the trial court in overruling the motion to suppress.

I am authorized to state that Boslaugh, J., joins in this dissent.