STATE OF NEBRASKA, APPELLEE, V. RONALD F.
WEINACHT, APPELLANT.

277 N. W. 2d 567

Filed April 17, 1979.   No. 42172.

Thomas M. Kenney, Douglas County Public Defender, Stanley A. Krieger and Bennett G. Hornstein, for appellant.

Paul L. Douglas, Attorney General, and Patrick T. O'Brien, for appellee.

Heard before KRIVOSHA, C. J., BOSLAUGH, McCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

BRODKEY, J.

Defendant below, Ronald F. Weinacht, appeals to this court from his conviction of the offense of robbery under section 28-414, R. R. S. 1943, and his sentence of 3 years imprisonment in the Nebraska Penal and Correctional Complex which was imposed by the trial court. His sole assignment of error as set out in his brief on appeal is that the District Court committed reversible error in failing to sustain the defendant's motion to suppress statements made by the defendant to the police during police interrogation. However, in his supplementary brief, he raises the additional issue that under sections 28-324 and 28-105(1), R. S. Supp., 1978, effective January 1, 1979, the statutory minimum sentence for the offense of robbery was reduced to 1 year imprisonment, as distinguished from the minimum statutory sentence of 3 years imprisonment for robbery under section 28-414, R. R. S. 1943, and that therefore his sentence under the latter section should be vacated and the cause remanded to District Court for resentencing. We affirm the conviction and sentence of the trial court.

We note at the outset that the bill of exceptions filed in this appeal consists of 41 pages devoted to the hearing on defendant's motion to suppress the confession he had given to the police, and 5 pages with reference to defendant's sentencing at a later date. Nowhere in the bill of exceptions is there set forth the proceedings of the trial itself, although it appears that at the sentencing which occurred on June 13, 1978, the court, in its opening remarks, made reference to the fact that defendant had appeared on April 27, 1978, and had submitted evidence by *stipulation* and that the court had found him guilty of the charge of robbery. There also appears

in the transcript the judge's docket sheet for the case, under date of April 27, 1978, showing that a Miranda hearing was held and testimony adduced, following which there is a notation that trial by jury was waived, the case submitted to the court on *stipulation*, and the court finds the defendant guilty as charged. The nature and contents of the stipulation referred to with reference to the trial itself is not shown in the record. However, in his brief on appeal defendant states that after the motion to suppress, the court admitted the statements made by the defendant "and the matter was stipulated to the court on that basis." Nowhere in its brief or in its oral argument does the State contradict or take exception to defendant's statement as set out above, and we shall therefore assume that the evidence upon which defendant was convicted by the trial court, pursuant to the stipulation referred to, was, primarily, the confession of the defendant which he had unsuccessfully attempted to have suppressed at the prior hearing on the same date.

We first turn to a consideration of defendant's claim that the District Court erred in failing to sustain defendant's motion to suppress the statements made by him to the police during police interrogation. Defendant contends that his statement made to the police should have been suppressed and not received in evidence because it was obtained in violation of his constitutional rights as declared in Miranda v. Arizona, 384 U. S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A. L. R. 3d 974 (1966). In that case the Supreme Court of the United States laid down the rule with reference to custodial interrogation as follows: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. * * * If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." See, also, State v. Krueger, 194

Neb. 304, 231 N. W. 2d 364 (1975); and State v. Moore, 189 Neb. 354, 202 N. W. 2d 740 (1972). Weinacht contends that he was subjected to continued interrogation by the police after he had indicated that he did not wish to talk without the presence of an attorney, and further that he did not make a valid waiver of his right to the presence and assistance of an attorney. The resolution of this issue necessitates an examination of the record. It appears that on Friday, March 10, 1978, the defendant was arrested in connection with the robbery of a Little King's restaurant on February 21, 1978, and was placed in the Douglas County jail. On Monday, March 13, 1978, Officer Pavel of the Omaha police took the defendant to the police station for questioning. There is a conflict in the evidence given by Officer Pavel and that given by the defendant as to what then transpired. Officer Pavel testified that at arriving at the police station he took the defendant to an interrogation room and commenced filling out a rights advisory form, later received in evidence, by asking the defendant each of the questions which appear on the exhibit. The defendant answered "yes" to the first five questions; but when he asked the defendant No. 6: "Knowing your rights in this matter, are you willing to make a statement to me now?", the defendant replied, "I would like to have an attorney present." Officer Pavel was then asked: "Q. Okay And what was your response or reaction when he told you that he wanted to have an attorney?" Officer Pavel responded: "As soon as he made that statement, I went over it again. I says, 'Does that mean you do not want to say anything without an attorney present?' And immediately the party says, 'I'll — I've changed my mind. I'd like to tell you about it.' Q. And how long did it take for him to verbalize to you that he had changed his mind? A. About three or four seconds. Q. So it happened almost instantaneously? A. Yes, it did." Officer

Pavel was then asked: "Okay. Okay, all right. Did You — At the time you talked to Mr. Weinacht, did you have in your possession a statement from Michael Owens? A. No. I knew it by heart because I took it from him. I did not have the statement there with me, no. Q. Okay. Did you — Before Mr. Weinacht changed his mind about having an attorney, did you ever confront him or continue to talk to him about what Michael Owens had told him — or — excuse me — what he had told you? A. No. Right after when I read that statement, I stood up, and I re-asked him that. I says, 'Does that mean that you do not want to say anything about this statement?' And I stood up to leave because I was just going to go in there and book him. And right then and there, he stated, 'No. I'd like to talk to you about it.'" Officer Pavel was also asked: "Q. All right. Did — At any time during the course of the interview, other than when he initially stated that he wanted to have his attorney and then changed his mind right away, did he ever state that he wanted to have an attorney? A. No, just that statement there. And then, when I came forth — As soon as he said that, I says, 'Does that mean that you do not want to say anything without your attorney?' That was just simultaneously."

It appears that the defendant was an accomplice or aider and abettor of Michael Owens, whose prior statement was referred to in the questioning, and that Owens had done the actual robbing of the restaurant, while the defendant remained outside in an automobile. Defendant's version of what transpired at the police station varies considerably from that testified to by Officer Pavel. He testified that after Officer Pavel had read him his rights and had asked him if he wanted to make a statement, he had replied: "No, not without an attorney present," and Officer Pavel had then stated: "Well, what would you say if I was to show you a statement handwrit-

ten by Michael Owens implicating you in the robbery?'' Defendant testified that Pavel then showed him Owens' statement, and that defendant then said: "Well, I'll change my mind. I'll talk." Defendant was then asked: "Q. All right. So is what you are telling the Court today is that you're disagreeing with Officer Pavel's testimony, as far as it relates to your advising him that you didn't want to make a statement or not without an attorney; and then he turned around and said, 'Does this mean you're not going to make a statement?' And then you said, 'Okay. I'll change my mind.' A. No. He said — He turned — He got — He opened the drawer, I think, and he pulled out this statement; and he said 'Well, what would you think if I showed you this statement by Michael Owens implicating you?' And I said, 'Well, I'll talk.' I started getting all shook up and everything. Q. All right. So you're disagreeing with at least that portion of his testimony? A. Yes sir." Later, defendant again testified that there is no question that he saw Michael Owens' statement in between his request for an attorney and his change of mind.

At the conclusion of the evidence the court stated: "Well, I think that obviously the issue of the credibility of the witnesses is one that has to be resolved by the jury. Taking Officer Pavel's testimony on the surface, he didn't see the defendant until such time as he advised him of his rights, and that he started to leave immediately, and within three seconds the defendant changed his mind. And he's got his constitutional rights, and he also has a kind of unwritten right to change his mind. And if you take Officer Pavel's testimony at its face value, he did immediately change his mind. * * * And the use of the confession during an interview, a confession of a co-defendant, does not in itself render the confession involuntary. So I think, even without resolving the issue of the credibility of the witnesses, which I

think is fundamentally for the jury, that the statement was freely and voluntarily given by the defendant after he was fully advised of his constitutional rights under the Miranda decision, and he made an intelligent, knowing waiver of those rights when he chose to make the statement. The Court makes a finding that the motion to suppress the confession is denied.''

While it is true, as stated in Miranda and repeated in Nebraska case law, that when, during a custodial interrogation, the defendant indicates he does not wish to talk without the presence of his attorney, questioning must cease; yet there is serious question whether his statement that he did not want to say anything without an attorney present, constituted continued interrogation. ''Interrogation'' occurs when the subject is placed under a compulsion to speak. Miranda v. Arizona, *supra*; State v. Godfrey, 131 N. J. Super. 168, 329 A. 2d 75 (1974). In the instant case, we do not believe that merely asking the defendant again about his refusal to talk without the presence of an attorney constituted a ''compulsion'' to talk. A similar situation was presented in United States v. Rodriguez-Gastelum, 569 F. 2d 482 (9th Cir., 1978). In that case the defendant was convicted in the United States District Court for the District of Arizona for an offense arising out of transporting marijuana. He appealed. The Court of Appeals held that: (1) A per se rule prohibiting a suspect in a criminal investigation from waiving his right to counsel after having initially made known his desire to have the assistance of counsel is neither necessary nor appropriate; and (2) under the circumstances, including the absence of any badgering, pressure, or coercion on the part of the customs officer, the defendant's answer to a question put by the customs officer in an attempt to clarify whether the defendant intended to talk to the officer constituted an explicit, clear, and unequivocal

waiver of defendant's prior request for assistance of counsel. The court held that even assuming that defendant's initial response to the customs officer was sufficient to invoke the protection of the Fifth and Sixth Amendments, where the officer asked a subsequent question in an attempt to clarify defendant's intention, and in the absence of any coercion, badgering, or pressure on the part of the officer, the defendant's answer — "That's fine." — to the officer's question — "Do you want to talk to me now without any attorney?" — constituted an explicit, clear, and unequivocal waiver of defendant's prior request for assistance of counsel and, therefore, incriminating statements which the defendant thereafter made were admissible in the narcotics prosecution. In that case the court stated: "Under *Miranda*, all questioning must stop once counsel has been requested. While we have little difficulty with that basic principle, the situation is more complex when the interrogation ceases, only to be resumed after an alleged reconsideration by the suspect.

"The factual patterns vary. At times the accused talks to the same officer who gave him the *Miranda* warnings. Or he may talk to another officer who has a different style, personality, and approach. Sometimes the suspect talks to an undercover agent believing him to be a fellow in crime. Or the *Miranda* warnings are forgotton or ignored both by the prisoner and the officer.

"The question is not quite so difficult when the interrogating officer is uncertain as to the intention of the suspect, as was Officer Brown, and seeks only a clarification." That is the situation now before us. To argue that Officer Pavel's second question constituted "further impermissible interrogation" is simply not true, as the question went to defendant's understanding of his rights, and not to his involvement in the robbery.

However, even assuming that the question did con-

stitute further interrogation, we do not believe the result in this case would be changed, even considering defendant's allegation that he was induced to change his mind and give his statement to the police by virtue of the fact that he was allegedly shown a prior confession or statement given by Owens. Officer Pavel testified he did not confront the defendant with Owens' statement, nor did he talk to him about what Owens had told him. The trial judge was faced with conflicting evidence upon this point, and made the determination that the statement was freely and voluntarily given by defendant after he was fully advised of his constitutional rights, and after he made an intelligent, knowing waiver of those rights. We have held that when evidence is conflicting regarding a motion for the suppression of evidence, the decision upon the motion is for the court and will not be reversed on appeal in the absence of an abuse of discretion. State v. Harig, 192 Neb. 49, 218 N. W. 2d 884 (1974); State v. Batchelor, 191 Neb. 148, 214 N. W. 2d 276 (1974). We find no abuse of discretion here, and the decision of the trial judge must be sustained.

We now consider defendant's contention that he is entitled to be sentenced under the provisions of sections 28-324 and 28-105 (1), R. S. Supp., 1978, which became law on January 1, 1979, rather than under section 28-414, R. R. S. 1943, which was in effect at the time of the commission of the crime. He bases his contention upon the case of State v. Randolph, 186 Neb. 297, 183 N. W. 2d 225 (1971), in which we held that where a criminal statute is amended by mitigating the punishment after the commission of a prohibited act but before final judgment, the punishment is that provided by the amendatory act "* * * unless the Legislature has specifically provided otherwise." We have reiterated the above rule in many subsequent cases. See, for example, State v. Goham, 187 Neb. 34, 187 N. W. 2d 305 (1971); State v.

Roberts, 188 Neb. 209, 196 N. W. 2d 118 (1972); State v. Patterson, 192 Neb. 308, 220 N. W. 2d 235 (1974). We point out, however, that our Legislature *has* specifically provided otherwise. In section 28-103(1), R. S. Supp., 1978, it is specifically provided: "The provisions of this code shall not apply to any offense committed prior to January 1, 1979. Such an offense shall be construed *and punished* according to the provisions of the law existing at the time of the commission thereof in the same manner as if this code had not been enacted." (Emphasis supplied.) We believe the foregoing language is clear, unequivocal, and not subject to interpretation. At the time of the commission of the offense of which the defendant was convicted, the penalty for robbery was imprisonment from 3 to 50 years. The defendant received the minimum sentence under that statute.

There appearing to be no error requiring reversal of this case, the judgment and sentence of the trial court must be affirmed.

AFFIRMED.