STATE OF NEBRASKA, APPELLANT, V.
PHILLIP MCNITT, APPELLEE.

298 N.W.2d 465

Filed November 3, 1980. No. 43635.

Don Walters for appellant.

L. William Kelly III of Kelly, Kelly & Kelly for appellee.

Heard before HASTINGS, J.

HASTINGS, J.

This is an appeal by the State, pursuant to Neb. Rev. Stat. § 29-824 (Reissue 1979), from an order of the District Court for Hall County, Nebraska, suppressing certain oral statements made by the defendant to a certain officer of the Grand Island police department. The statements were made in connection with the alleged participation of the defendant in the homicide of Brian Crittenden.

The record shows that on March 25, 1980, at approximately 2:30 a.m., Hall County deputy sheriff Rodger L. Williams and Grand Island police lieutenant Bradley L. Brush, arrested the defendant, pursuant to an arrest warrant, at a residence in the village of Carleton, Nebraska. Williams read the Miranda warnings to the defendant and the defendant said that he understood the warnings and wanted an attorney. He was told by the officer that it would be arranged for him to get an attorney when they got back to Grand Island. During the trip back to Grand Island, where they arrived at approximately 4:30 a.m., some attempt at conversation with the defendant was made by the officers, but "[h]e wouldn't make any sound at all . . . ."

Upon arriving at the Public Safety Center in Grand Island, the defendant was interrogated by Carroll P. Ward, a Grand Island police officer, in the presence of Williams and Brush. Ward read the Miranda warnings to the defendant, who said that he understood them. However, when asked if he was willing to give a statement, the defendant's reply was that he wanted to see an attorney.

No steps were taken to obtain an attorney, but Ward continued to question the defendant. Ward asked him if he had seen the arrest warrant, and when told that he

had not, Ward showed it to defendant and read the warrant to him. Defendant was then asked if he had any questions as to what he was charged with, and defendant replied that he did; he wanted to know what the penalty was for the particular charge, i.e., aiding and abetting the commission of murder. It was then explained to him by the officer that the penalty would be the same as that for first degree murder, life imprisonment or death. Defendant was then told that others had been arrested; that the principal defendant had confessed to doing the shooting; and that person had involved defendant in the crime, as had another witness. The officer then told the defendant that they would be presenting all the evidence to the county attorney's office at 8 o'clock the next morning; that he had exercised his rights; and that "we would be more than willing to advise the County Attorney of that fact," and "if that's what he wanted us to do that was fine with us." Officer Ward then testified further as follows: "I believe I advised Phil that he was in a droit. [sic] He did have a right to exercise his rights, he also had a right to change his mind. And that if he were to change his mind and give us a statement that we would include his story in the presentation to the County Attorney."

Officer Ward also told the defendant that he would have to understand that if he did change his mind and give a statement, and it implicated him in the charge of aiding and abetting, he would have to stand trial, but if he was not involved to that extent, the county attorney might take all the information into consideration and might file a lesser charge. The defendant then said: "All right, I'll tell you what I know about it and what I did."

The State contends that the defendant, after having first declined to waive his rights, within a matter of 10 minutes changed his mind and freely, voluntarily, knowingly, and intelligently waived the presence of an attorney, and in like manner made the incriminating statements.

"Where the government asserts waiver, however, it bears a heavy burden of proving its claim. *Miranda v. Arizona,* . . . . This burden is not discharged by the mere fact that statements were eventually obtained from an accused. *United States v. Blair,* 470 F.2d 331 (5th Cir. 1972). Nor may the government establish waiver by the mere repetition of *Miranda* warnings. [Citations omitted.]" *United States v. Womack,* 542 F.2d 1047, 1050-51 (1976).

We recently reviewed the standards for the admissibility of incriminating statements in *In re Interest of Durand,* 206 Neb. 415, 293 N.W.2d 383 (1980). Once an individual invokes his right to remain silent, the interrogation must cease, for otherwise the in-custody interrogation setting operates on the individual to overcome free choice in producing a statement. *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). The *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. *Rhode Island v. Innis,* 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). The continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning that would undermine the will of the person being questioned. *Michigan v. Mosley,* 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975).

In *Durand, supra,* we found that the defendant was subjected to the functional equivalent of questioning after he requested an attorney. "The police officer should have known that showing the defendant the police reports was likely to elicit an incriminating response from the defendant. If a suspect is told he has a right to have an attorney present during interrogation and he chooses to cut off questioning until counsel can be obtained, his choice must be 'scrupulously honored' by the police. [Citations omitted.]" *Durand* at 420, 293 N.W.2d at 386-87.

The situation in this case is no different. After the defendant demanded an attorney for the second time,

the officer in no way "scrupulously honored" the defendant's request. Instead, the officer continued to talk to the defendant; to offer to explain the warrant, what the defendant was charged with, and what the possible penalty would be; he told the defendant that others had been arrested who had given statements and who had implicated him; defendant was told with what he would be charged if he did not talk and what he might be charged with if he did give information; and he was also assured that he had a right to change his mind about wanting a lawyer. This certainly was the "functional equivalent" of questioning, and for all intents and purposes, was done in a manner to exert influence upon the defendant to waive certain of his rights.

In order to determine whether or not the statement was voluntary, we must look to the totality of the circumstances in any particular case. *State v. McDonald*, 195 Neb. 625, 240 N.W.2d 8 (1976). It is well settled that the finding of the trial court that statements or confessions were intelligently or voluntarily made will not be set aside on appeal unless the finding is clearly erroneous. *State v. Prim*, 201 Neb. 279, 267 N.W.2d 193 (1978). It follows that the finding by a trial court that a statement is involuntary will be given similar treatment. A review of the testimony given at the suppression hearing reveals no evidence established by the State to prove a voluntary and intelligent waiver on the part of the defendant.

The action of the trial court was correct in finding that the statements should be suppressed as having been involuntarily given, in violation of *Miranda*, and is affirmed.

AFFIRMED.