STATE OF NEBRASKA, APPELLEE, V. RANDALL S. WHITMORE, APPELLANT.
378 N.W.2d 150

Filed December 13, 1985.   No. 84-950.

Emil M. Fabian and Barbara Thielen of Taylor, Fabian, Thielen & Thielen, for appellant.

Robert M. Spire, Attorney General, and Lynne R. Fritz, for appellee.

KRIVOSHA, C.J., WHITE, HASTINGS, CAPORALE, and SHANAHAN, JJ.

HASTINGS, J.

The defendant, Randall S. Whitmore, was convicted by a jury of five felony counts involving violations of the Nebraska Uniform Controlled Substances Act (Neb. Rev. Stat. §§ 28-401 et seq. (Reissue 1979 & Cum. Supp. 1984)). In his appeal to this court he assigns as error: (1) The admission of evidence obtained by claimed illegal wiretaps; (2) The failure to suppress certain statements made by the defendant; (3) Insufficiency of the evidence to support verdicts of guilty; and (4) Excessiveness of the sentences imposed. We affirm.

The violations were alleged to have occurred on or about November 23, 1981. The wiretap surveillance covered the period of October 21 to December 1, 1981. Whitmore claims, inter alia, that the wiretap order was facially insufficient; that the police officers failed to minimize the intrusiveness of the search; and that the interim reports filed with the district court intentionally or recklessly misrepresented information.

These three issues were disposed of adversely to the defendant in a one-judge opinion, *State v. Whitmore, White, and Henderson*, 215 Neb. 560, 340 N.W.2d 134 (1983). That

opinion was adopted in toto by the court in *State v. White*, 220 Neb. 527, 371 N.W.2d 262 (1985), and disposes of those issues here.

In this appeal the defendant makes one new argument with regard to the wiretap, i.e., lack of necessity, citing *State v. Lane*, 211 Neb. 46, 317 N.W.2d 750 (1982). Whitmore asserts that the government must show by *facts* in its application that there is a retrospective and prospective failure of alternative investigative techniques before a wiretap may issue. See *State v. Golter*, 216 Neb. 36, 342 N.W.2d 650 (1983).

In *Golter* this court expounded at length on the necessity requirement embodied in Neb. Rev. Stat. § 86-705(1)(c) and (3)(c) (Reissue 1981). In stating that the purpose of the necessity requirement is not to foreclose a wiretap until every conceivable investigative technique has been exhausted, we went on to say: "Rather, the full and complete statement informs a court of the nature and progress of the investigation, explains the difficulties involved in normal investigative techniques, and assures that a wiretap is not obtained where conventional investigative techniques would be sufficient to expose a crime." 216 Neb. at 42, 342 N.W.2d at 654.

While requiring a showing of failure of alternative means, necessity

"does not require the exhaustion of all other possible or reasonable avenues of investigation. It does not, in fact, require that other methods even be tried if the application demonstrates other procedures are unlikely to succeed or are too dangerous. . . . '. . . It is sufficient that the government show that other techniques are impractical under the circumstances and that it would be unreasonable to require pursuit of those avenues of investigation. The government must, however, *fully explain* . . . the *basis* for such a conclusion.' . . ."

*Id*. at 41, 342 N.W.2d at 653-54 (quoting *State v. Kolosseus*, 198 Neb. 404, 253 N.W.2d 157 (1977)).

Defendant argues that the affidavits in support of the issuance of search warrants did not contain necessary facts regarding the investigative technique or surveillance. The affidavit of October 21, 1981, does indeed contain statements

of a conclusory nature which recited that surveillance had been tried and had failed with no hope of future success.

However, there are facts recited throughout the affidavit in support of that conclusion. It is stated that surveillance of the large apartment building at 2560 Marcy Street was difficult because it was not possible for the individual doing the surveillance to remain stationary and watch the front door without detection. Additionally, it was claimed, observing a party to enter the complex would not reveal to which apartment that individual was going.

At another point in the affidavit it was recited that in attempting surveillance of the defendant's farm home located near Louisville, it was not possible to have either a fixed or moving surveillance. This was because officers were not able to get close enough to the farmhouse to see any activity that would disclose narcotics transactions. This was explained as being due to the close proximity of trees and growing crops to the farmhouse. The affidavit also contained a recitation of attempts by various law enforcement officials to place the defendant under surveillance while driving his car, which was unsuccessful because of the erratic manner of his driving, i.e., changing directions, driving down alleys, and suddenly stopping to see if someone was following him.

The use of informants was employed to gain detailed information regarding the defendant's drug activities. However, one or more of the informants who identified defendant as their source of drugs did not want to become involved in the investigation and would not agree to testify against defendant.

There were facts recited in the affidavit from which it could be concluded that pen registers would not be productive. One of the critical phone numbers was used only for recording incoming messages and was not used to dial out. A pen register, it was stated, could not be used because it did not record incoming calls.

Considering all of the affidavits in support of the various applications, we are convinced that they supported a believable conclusion that reasonable or ordinary investigatory techniques had indeed been tried and had failed, or appeared

unlikely to succeed, in obtaining evidence regarding the defendant's illegal drug trafficking. That is all the law requires.

Defendant's second assignment of error has to do with the ruling of the trial court which refused to quash an admission made by the defendant absent *Miranda* warnings. This admission had to do with the defendant's ownership of certain keys which included keys to a 1971 brown Plymouth Valiant automobile and a toolbox located in the trunk.

On November 23, 1981, the police searched that particular automobile, pursuant to a search warrant. The warrant had been issued on the strength of an affidavit which recited in substance that, according to informants, this particular automobile was used by the defendant and John White to cache illicit drugs, and which, although registered in the name of a fictitious Mark Salem, was nevertheless owned by the defendant. The search revealed several items which, upon analyzation, were found to be controlled substances. It was necessary for the State to somehow tie the defendant into the ownership or use and control of this automobile. Its attempt to do so is the crux of defendant's objection.

On November 23, 1981, the police executed a search warrant permitting the search of the defendant's person and the premises at 2722 North 64th Street. The premises were entered by way of the front door through a glass panel that had been kicked out. The defendant was placed under arrest, which was on the strength of probable cause, without the issuance of an arrest warrant. He was not given *Miranda* warnings.

Nevertheless, the officers asked the defendant if he was the owner of a specific set of keys found on the dresser in the room in which defendant was located, and he answered that he was. Two of the keys were found to fit the trunk and door lock of the 1971 Valiant, and one fit a toolbox in the trunk. Because the admission as to ownership of the keys was obtained at a time when the defendant was under arrest and had not been read his *Miranda* rights, defendant claims his motion to suppress that evidence should have been sustained.

> [T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the

use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.

*Miranda v. Arizona,* 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). See, also, *State v. Andersen,* 213 Neb. 695, 331 N.W.2d 507 (1983).

In *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), the U.S. Supreme Court further defined interrogation by stating:

[T]he term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.

See, also, *State v. Lamb,* 213 Neb. 498, 330 N.W.2d 462 (1983).

The defendant was clearly questioned, while in custody, without the protection of his *Miranda* warnings. However, the State argues that the questioning here did not rise to the level of "interrogation" which triggers the requirements of *Miranda,* citing *State v. Simoneau,* 402 A.2d 870 (Me. 1979) (a brief neutral question not part of an effort to elicit a confession). It was, the State continues to urge, a natural response to a spontaneous question which had nothing to do with investigating criminal activity. *State v. Link,* 289 N.W.2d 102 (Minn. 1979) (innocuous biographical questions). See, also, *State v. Lamb, supra* at 502, 330 N.W.2d at 466 (citing *Com. v. Shepherd,* 269 Pa. Super. 291, 409 A.2d 894 (1979)): " 'Where there is no expectation of an admission and the police conduct is not an attempt to obtain an admission, there is no interrogation.' "

The State further calls attention to the testimony of the arresting officer who said that they knew they were going to transport the defendant and his companion to the police station

before completing the search of the residence, so they were looking for a key to resecure the premises. It was against that background, the State insists, that the defendant was first asked if the keys were his, and then whether there was a key to the front door on the ring.

In other words, the claim is made that the question regarding ownership of the key was a neutral question not designed to elicit a confession or admission, and it was only fortuitous that a key to the Valiant automobile was later discovered and tied to defendant's earlier admission of ownership.

However, it is questionable that it was necessary to determine ownership of the keys to ascertain whether a key to the front door was among them. Secondly, it would be difficult to secure the premises by locking a door which had never been unlocked, but which had permitted entrance through a kicked out glass panel. Finally, as the defendant points out, the arresting officer, on cross-examination, stated that he noted, in checking the evidence they had gathered, that there were two Chrysler Corporation keys on one of the keyrings. He admitted that he was aware of the earlier search of the Plymouth Valiant and, knowing those facts, wanted to check the keys to see if they fit the ignition and trunk lock of that vehicle.

However, there is nothing in the record to suggest that the officer recognized the Chrysler keys on the ring before inquiring as to ownership. Whether he did or not is a question of fact. Factual findings by the trial court on a motion to suppress will not be overturned on appeal unless clearly wrong, looking at a totality of the circumstances. *State v. McCarthy*, 218 Neb. 246, 353 N.W.2d 14 (1984).

In *State v. Barnes*, 54 N.J. 1, 252 A.2d 398 (1969), defendant was convicted of receiving stolen goods. Those goods were checks. Defendant had been arrested as an escapee, while driving an automobile. After stopping the defendant the police noticed the checks on the floor and asked to whom they belonged, and the defendant stated that they were hers. In concluding that the defendant had not been subjected to questioning within the meaning of *Miranda*, the court stated as follows:

What was comprehended by *Miranda* was a process of

"custodial interrogation" which the Supreme Court found to be inherently coercive. The single question asked in this case was not part of the investigation which led to the defendant's apprehension, nor was it one of a series of investigatory queries. Most important, it was not the type of question which centered blameworthiness on the defendant. . . .

. . . It seems clear to us that the essence of the situation was not an officer imposing a process of interrogation upon a suspect, but an officer reacting naturally and spontaneously to the scene before him.

*State v. Barnes, supra* at 6, 252 A.2d at 401.

We believe the question as to the ownership of the keys in the present case was a neutral question which would fall within the class of brief, spontaneous reactions to the situation then confronting the officer, and was not for the purpose of interrogating the defendant to obtain evidence to establish guilt. It cannot be said that the trial court was clearly wrong in overruling the motion to suppress.

There is yet another reason why defendant's second assignment of error must be overruled, and an explanation of that position will meet defendant's argument as to the sufficiency of the evidence to support his convictions.

Even though a ruling on the admissibility of evidence is erroneous, it may be considered to be harmless error not requiring reversal of an otherwise valid conviction. For the error to be prejudicial, we must find that the State's case was significantly less persuasive had the disputed testimony been excluded. *State v. Andersen*, 213 Neb. 695, 331 N.W.2d 507 (1983).

The record disclosed that both the Plymouth Valiant and a Lincoln automobile were registered in the fictitious name of Mark Salem. Both defendant and John White drove the Lincoln. A tape of a telephone conversation between White and the defendant appeared to refer to the ownership or control of these two vehicles. Specifically, in what seemed to be a conversation regarding the Lincoln, the defendant suggested that White contribute on some of the repair bills. White refused and the defendant said he would take the car back.

Discussion then centered on use of the "brown mobile" (Plymouth Valiant), which White said he would then have to use and the defendant would have to find someplace else to keep "something" then, and defendant replied he would have to sell it. White said he was referring to defendant's "tools and stuff." When it became apparent that White was serious about driving that vehicle, the defendant said "Okay."

In that same conversation, when White suggested that he would have to drive the "brown mobile," the defendant replied that he would have to get the transmission fixed, but White merely stated that he would keep putting "quarts" in it, suggesting that the vehicle was leaking oil. Further connecting the "brown mobile" to the brown Plymouth Valiant in which the drugs were found, a police officer testified that at the time of the search there was an oil slick underneath the transmission case where the Valiant was parked.

As previously stated, the keys were located on the dresser immediately adjacent to the bed which defendant occupied at the time. The keyring contained a key to defendant's "toolbox" located in the trunk of the automobile. The keyring also contained numerous keys to video games, such as Donkey Kong and Pac-Man. It is undisputed that defendant was in the business of operating these video games.

Defendant's admission that the keys were his merely confirmed the obvious, and the evidence of defendant's control of the vehicle and the drugs inside would not be made any the less persuasive had the evidence been kept out.

Control of the drugs found in the automobile was really the key issue in the State's case against the defendant. Our stated conclusion in that regard adequately disposes of the defendant's claim that the evidence was insufficient to support the verdicts. There is no merit to that assignment of error.

The defendant was sentenced to terms of imprisonment of 3 to 5 years on count I; 2 to 4 years on each of counts II, III, and IV, concurrently with each other but consecutively to count I; and, on an additional charge in a companion case, to a term of 1 to 3 years, to run concurrently with the sentences in counts II, III, and IV.

These were, respectively, Class II, Class III, and Class IV

felonies. Therefore, each sentence was within the terms prescribed by statute. Neb. Rev. Stat. § 28-105 (Reissue 1979). A sentence imposed within statutory limits will not be disturbed on appeal absent an abuse of discretion by the trial court. *State v. McKichan*, 219 Neb. 560, 364 N.W.2d 47 (1985).

However, defendant argues that his coconspirator, John White, received substantially lesser penalties. Neither White's nor, for that matter, defendant's presentence investigation has been made a part of the record. But assuming that White's sentences, as stated by defendant, amounted to a total of 3 to 5 years' imprisonment, as compared to defendant's 5 to 9 years, there was ample justification for the different treatment accorded defendant.

The record discloses that Whitmore, for whom White worked, was engaged in a large-scale, wholesale, illicit drug operation. Clearly, the defendant, by having a greater degree of responsibility in the distribution of controlled substances, is the more culpable. Defendant was in the business purely for monetary gain. Any sentences less than those imposed in this instance might tend to depreciate the seriousness of the offense. There was no abuse of discretion on the part of the trial judge in imposing the sentences. They were entirely appropriate, and we are not required to disturb those sentences solely because someone else was treated more leniently. *State v. Morrow*, 220 Neb. 247, 369 N.W.2d 89 (1985).

The judgments of the district court are affirmed.

AFFIRMED.

BOSLAUGH, J., participating on briefs.

WHITE, J., concurs in the result.

CAPORALE, J., concurring.

I agree with the majority's holding that the admission into evidence of Whitmore's response concerning ownership of the keys was, beyond a reasonable doubt, harmless error. There was ample evidence beyond that response which identified the Valiant as the automobile discussed by White and Whitmore and, therefore, to connect Whitmore with the Valiant. It is that evidentiary consideration which, pursuant to *Holloway v. Arkansas*, 435 U.S. 475, 98 S. Ct. 1173, 55 L. Ed. 2d 426 (1978), and *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L.

Ed. 2d 705 (1967), permits us to affirm the district court's judgment. Accord *State v. Andersen*, 213 Neb. 695, 331 N.W.2d 507 (1983).

I write separately, however, because I cannot agree with the majority's obiter dictum that Whitmore's *Miranda* rights were not violated.

As noted in the majority's opinion, the prosecution may not use statements stemming from custodial interrogation of a criminal defendant unless it demonstrates that the *Miranda* warnings were first given and waived. Since the State admits Whitmore was in custody when he was questioned about ownership of the keys, the relevant issue becomes whether such questioning constituted interrogation.

Interrogation has been variously defined in our cases. *State v. McNitt*, 207 Neb. 296, 299, 298 N.W.2d 465, 466 (1980), noted that "[t]he *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." Interrogation occurs, according to *State v. Weinacht*, 203 Neb. 124, 130, 277 N.W.2d 567, 571 (1979), "when the subject is placed under a compulsion to speak." See, also, *In re Interest of Durand. State v. Durand*, 206 Neb. 415, 293 N.W.2d 383 (1980). The following language from *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), shows up frequently in our decisions: "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." See, also, *State v. Sutton*, 207 Neb. 778, 301 N.W.2d 335 (1981); *In re Interest of Durand. State v. Durand, supra.*

In *State v. Thunder Hawk*, 212 Neb. 350, 322 N.W.2d 669 (1982), we held that statements made by the defendant after he had been placed under arrest violated *Miranda* and were inadmissible. The defendant in *Thunder Hawk* had been involved in an automobile accident and, before being transported to a hospital, was arrested for driving a motor vehicle while under the influence of alcohol. At the hospital a police officer questioned Thunder Hawk about the accident

without first informing him of his rights under *Miranda*. Among other questions, Thunder Hawk was asked if he was driving, to which he replied yes, and was also asked who owned the vehicle, to which he replied that he did not know. At the time of this questioning the officer had in his possession the vehicle's registration, which indicated the vehicle.was titled to a third party. The defendant was subsequently charged with theft of movable property. The questioning officer testified that he asked the questions solely for assistance in filling out his accident report. The officer's explanation was quickly rejected by this court, which determined that the interrogation was clearly aimed at soliciting incriminating statements. Even though the type of questioning which occurred in *Thunder Hawk* was found not permissible, we did note that "[v]olunteered and general on-the-scene questioning is not prohibited" by *Miranda*. *Id*. at 355, 322 N.W.2d at 672.

In the present case Whitmore was not subjected to some general on-the-scene questioning. Rather, he was asked whether he owned a specific set of keys. Just as in *Thunder Hawk*, the police officer's reason for asking the question does not withstand scrutiny. Why it was necessary to determine ownership of a set of keys before such could be used to lock an already locked door which had been partially destroyed in gaining entrance is far from readily apparent. The officer knew of the earlier successful search of the Plymouth Valiant and of the need to connect Whitmore with that vehicle. The officer surely knew that people usually carry their car keys on some type of chain even if he did not notice the Chrysler Corporation keys until after he had questioned Whitmore—a fact which is not clear from the evidence. The officer should have known that his questioning was "reasonably likely to elicit an incriminating response." Indeed, the officer's failure to give a plausible reason for his question inescapably leads to the conclusion that an incriminating response is exactly what he wanted and got.

This conclusion is also compelled by the *Thunder Hawk* decision itself. The relevant question in that case involved ownership of a vehicle, whereas in this case it involved ownership of a set of keys. How the one constitutes

interrogation and the other does not cannot be explained on any rational basis. Furthermore, *State v. Barnes*, 54 N.J. 1, 252 A.2d 398 (1969), cited by the majority to support its conclusion, on close examination does not do so. In *Barnes* the defendant was stopped and arrested on an escape charge, at which time the police noticed numerous checks on the floor of the automobile. Several persons other than the defendant were also in the automobile. The police asked to whom the checks belonged, and the defendant's response that they were hers was admitted in her later trial for receiving stolen goods. In finding no interrogation had occurred, the *Barnes* court noted that "the question was open-ended in its form, not focusing on any particular suspect, and unrelated to the cause of her arrest as an escapee." *Id*. at 6, 252 A.2d at 401. The same cannot be said of the question asked in the present case.

KRIVOSHA, C.J., and SHANAHAN, J., join in this concurrence.