PEOPLE v BENJAMIN

Docket No. 47024. Submitted September 3, 1980, at Lansing.—Decided November 20, 1980.

Rhonda Benjamin was convicted of carrying a concealed weapon and was acquitted of aiding and abetting the crime of larceny in a building, Jackson Circuit Court, James G. Fleming, J. She appeals, alleging that the trial court erred in denying her motion to dismiss the charge of carrying a concealed weapon on the ground that the information was deficient, in denying her motion for a directed verdict of acquittal on the charge of aiding and abetting, and in admitting certain evidence and that an admission she made to the police was obtained by means of an impermissible interrogation. *Held:*

1. The language used in the information adequately informed defendant of the nature and character of the charged offense, thus, her motion to dismiss the charge was properly denied.

2. Defendant's rights to equal protection and due process of law were not violated by the prosecution's decision to charge her with larceny in a building rather than simple larceny.

3. Defendant's sentence was properly imposed without resort by the trial court to improper criteria, was within permissible statutory limits, and did not constitute cruel and unusual punishment.

4. The proofs offered by the prosecution up to the time that

REFERENCES FOR POINTS IN HEADNOTES
[1] 41 Am Jur 2d, Indictments and Information § 89 *et seq.*
[2] 41 Am Jur 2d, Indictments and Information § 226.
  63 Am Jur 2d, Prosecuting Attorneys §§ 25, 26.
[3] 5 Am Jur 2d, Appeal and Error § 818.
[4] 75 Am Jur 2d, Trial § 496 *et seq.*
[5] 68 Am Jur 2d, Searches and Seizures § 46.
[6, 8, 9] 29 Am Jur 2d, Evidence §§ 555, 640.
  What constitutes "custodial interrogation" within rule of Miranda v Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.
  Necessity of informing suspect of rights under privilege against self-incrimination, prior to police interrogation. 10 ALR3d 1054.
[7] 29 Am Jur 2d, Evidence §§ 523 *et seq.,* 611 *et seq.*
  Admissibility of defense communications made in connection with plea bargaining. 59 ALR3d 441.

defendant moved for a directed verdict of acquittal on the charge of aiding and abetting the crime of larceny in a building, when considered in a light most favorable to the prosecution, were such that a rational trier of fact could have found that the essential elements of the crime were established beyond a reasonable doubt. Her motion was properly denied.

5. Defendant voluntarily consented to the search of her purse, rendering the search valid and vitiating any claim of illegality stemming from the search. Accordingly, the evidence discovered during the search was properly admitted into evidence.

6. Defendant's admission to carrying the concealed weapons was an unforeseen result of the actions of the police which were not the functional equivalent of interrogation. Thus, her spontaneous declaration was admissible into evidence.

Affirmed.

1. INDICTMENT AND INFORMATION — CRIMINAL INFORMATION — STATUTORY LANGUAGE — SUFFICIENCY.

The use of statutory language in an information charging an offense is sufficient to withstand a motion to dismiss where it adequately informs a defendant of the nature and character of the offense charged.

2. PROSECUTING ATTORNEYS — PROSECUTORIAL DISCRETION — FELONY CHARGES.

A prosecutor may properly exercise his discretion in charging a defendant with a felony rather than a misdemeanor where the defendant's acts will support either charge.

3. APPEAL — SENTENCES — STANDARD OF REVIEW — CRIMINAL LAW.

The Court of Appeals will not disturb the sentence of a trial court on appeal where the sentence is within statutory limits and the trial court considers no improper criteria in deciding on the sentence to impose.

4. CRIMINAL LAW — MOTIONS FOR DIRECTED VERDICT OF ACQUITTAL — DENIAL OF MOTION.

It is proper for a trial court to deny a motion for a directed verdict of acquittal where a rational trier of fact could find that the essential elements of a crime were established beyond a reasonable doubt, considering the evidence presented by a prosecutor up to the time the motion is made in a light most favorable to the prosecution.

5. SEARCHES AND SEIZURES — PRE-ARREST SEARCHES — VOLUNTARY
CONSENT — EVIDENCE — ADMISSIBILITY.

A search prior to an arrest is valid where voluntary consent of
the person to be searched is obtained before the search is
conducted, and any evidence subsequently discovered should
not be excluded from admission into evidence during a trial.

6. CRIMINAL LAW — WARNING OF RIGHTS — IDENTIFICATION OF SUS-
PECT.

*Miranda* warnings are required to be given once an investigation
has focused on a particular suspect, even where the suspect is
not in custody.

7. CRIMINAL LAW — POST-CUSTODY STATEMENTS — VOLUNTARY STATE-
MENTS — CONSTITUTIONAL LAW — WARNING OF RIGHTS —
WORDS AND PHRASES.

Not all statements obtained by police after a person has been
taken into custody should be considered products of interroga-
tion, and volunteered statements of any kind are not barred by
the Fifth or Fourteenth Amendments; interrogation which
would trigger the necessity of giving a defendant *Miranda*
warnings should reflect a measure of compulsion above and
beyond that inherent in the custody itself.

8. CRIMINAL LAW — WARNING OF RIGHTS — INTERROGATIONS OF
SUSPECTS IN CUSTODY.

*Miranda* safeguards should be observed whenever a person in
custody is subjected to express questioning by the police or to
any words or actions on the part of the police that the police
should know are reasonably likely to elicit an incriminating
response from the suspect.

9. CRIMINAL LAW — WARNING OF RIGHTS — PROTECTION OF SUSPECTS
IN CUSTODY — UNFORESEEN RESULTS OF POLICE ACTIONS.

*Miranda* safeguards vest a suspect in custody with an added
measure of protection against coercive police practices without
regard to objective proof of underlying police intent, but police
should not be held accountable for the unforeseeable results of
words or actions which they should not have known would be
likely to elicit an incriminating response.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *Edward J. Grant,* Prosecuting Attorney, and *John L. Wildeboer,* Chief Appellate Attorney, for the people.

*Myron E. Sanderson,* for defendant on appeal.

Before: Danhof, C.J., and Bronson and Cynar, JJ.

Cynar, J. Following a jury trial, defendant was found guilty of carrying a concealed weapon, MCL 750.227; MSA 28.424, and acquitted of a charge of aiding and abetting the crime of larceny in a building, MCL 750.360; MSA 28.592. Defendant was sentenced to four to seven years imprisonment and now appeals as of right.

Barbara Gumbert, manager of the Bottom Half Clothing Store in the Westwood Mall in Jackson, received a shipment of 35 Huckapoo shirts on February 14, 1979. After she unpacked and ticketed them, they were put on special hangers and placed on a rack near the front entrance of the store. No other mall stores carried that type of shirt. At approximately 8:30 p.m., defendant and a companion, later identified as Marketta Landrum, entered the store and began looking at merchandise, including the shirts. They both tried on jackets, and defendant asked Ms. Gumbert to put one on hold. Ms. Gumbert went to the back room and, when she returned, defendant filled out a form in order to purchase the jacket through the Community Action Program. While she was away from the merchandise area, there was no other salesperson on the floor assisting her, and defendant and Landrum were the only customers in the store. Ms. Gumbert had given the two women store bags, upon their request, and, after a brief conversation, they left. When she began counting the merchandise, she noticed six Huckapoo shirts and hangers missing.

After the mall security was alerted, Ms. Gumbert and security officer Jim Schmall went to

Kinney's shoe store and waited for the two women to come out. They followed them to the mall entrance, and another security officer, John Rogus, stopped them at entrance. Ms. Gumbert asked Marketta Landrum whether she could look inside the Bottom Half bag she was carrying, and, when she opened it, she saw the shirts. Landrum denied taking them, and defendant "didn't see why she had to be with her at the time".

After the police arrived, they escorted defendant, Landrum, and Ms. Gumbert into a room inside Alladin's Castle. One of the officers, Jackson County Deputy Norman Purucker, found a razor knife and a jackknife in defendant's purse. The jackknife was open and was approximately eight to ten inches long. Only two of the six shirts found in the bag still had tags. Ms. Gumbert admitted, during cross-examination, that she did not see the jackknife until it was no longer in defendant's purse.

Mark Williston, assistant manager at Kinney's shoe store, testified that, after he finished waiting on the defendant, he checked one of the handbags at which she had been looking because it felt "heavier than usual". When he opened it, he found plastic hangers with the logo "Bottom Half" on the top of the hanger. Williston left the store and, after he spoke with the salesperson at the Bottom Half, went to Alladin's Castle. As he turned the bag over to deputy Purucker, he saw him holding a jackknife. He later discovered the missing shirt tags in his store.

James Schmall observed the Jackson County deputy search the two women and take two knives from one of their purses. He did not remember, however, from which purse they were taken.

Deputy Purucker testified that, after he arrived

at the mall, he asked defendant and Landrum their names and addresses. He then asked defendant for permission to search a purse she was holding, and she consented after the officer had advised her that she could refuse his request. He found a large, pearl-handled jackknife and a Stanley utility knife. When he showed her the knives, she said, "I carry them when I'm walking down Frances Street, never know when I might need them". He did not give her a *Miranda*[1] warning prior to her making the statement, and he denied that he asked her any questions about the alleged theft. He also denied that he had any reason to suspect that defendant was carrying any concealed weapon when he searched her purse. Finally, he characterized her statements as spontaneous since she made them as soon as he held up the knives.

Jackson County Deputy Sheriff William Tedder had accompanied deputy Purucker to the mall. He corroborated Purucker's testimony regarding the discovery of the knives in defendant's purse and her statements regarding why she carried them.

Marketta Landrum denied that she and defendant had any prior conversation about stealing anything at the mall and testified that she did not tell defendant that she took the shirts.

The trial court had denied defendant's motion to dismiss the aiding and abetting count made at the close of the prosecution's case since there was "some evidence" from which a reasonable person could conclude that defendant acted as a decoy in order to assist her companion.

The trial court had also ruled that, based upon the consensual nature of the search, the knives were admissible into evidence. In addition, the

---

[1] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694; 10 ALR3d 974 (1966).

court ruled that defendant's statements were voluntary since they were not made in response to any police interrogation and, therefore, *Miranda* was inapplicable.

Defendant first argues that the trial court erred in denying defendant's motion to dismiss the charge of carrying a concealed weapon (CCW). Defendant claims that the information was deficient in failing to specify that the knives found in defendant's purse were carried for either an offensive or defensive purpose. Where statutory language is used in an information in charging an offense, it is sufficient if it adequately informs a defendant of "the nature and character" of the charged offense. *People v Lightstone,* 330 Mich 672; 48 NW2d 146 (1951), see also, *People v Adams,* 389 Mich 222; 205 NW2d 415 (1973). The language used in the information adequately informed defendant of the nature and character of the charged offense.

We further find no violation of defendant's rights to equal protection and due process of law arising from the prosecution's decision to charge defendant with larceny in a building, a felony, as opposed to simple larceny, a misdemeanor. The decision to charge defendant with the former was a proper exercise of prosecutorial discretion and not constitutionally infirm. *People v Evans,* 94 Mich App 4; 287 NW2d 608 (1979), *People v Birmingham,* 13 Mich App 402; 164 NW2d 561 (1968).

As defendant's sentence was within permissible statutory limits, MCL 750.227; MSA 28.424 and MCL 769.10; MSA 28.1082, and since the trial court considered no improper criteria in sentencing defendant, we decline to disturb the trial court's decision with respect to the sentence meted out, and we likewise reject defendant's argument

that her sentence constituted cruel and unusual punishment as being grossly disproportionate to the offense (CCW and second felony offender). *People v Lorentzen,* 387 Mich 167; 194 NW2d 827 (1972), *People v Cox,* 53 Mich App 314; 218 NW2d 843 (1974), *lv den* 392 Mich 803 (1974).

Next, we address defendant's contention that the trial court erred in denying her motion for a directed verdict of acquittal on the charge of aiding and abetting the crime of larceny in a building. Defendant, as noted hereinbefore, ultimately was acquitted of that charge by the jury. Although not expressly argued by defendant in her brief on appeal, presumably the prejudice which she contends followed from the denial of the motion for a directed verdict was the consideration by the jury of a charge unwarranted by the proofs which substantially decreased defendant's chances of acquittal on any valid charge because of the possibility of a compromise verdict. *People v Vail,* 393 Mich 460, 464; 227 NW2d 535 (1975).

It is proper to deny a motion for a directed verdict of acquittal if, considering the evidence presented by the prosecution up to the time the motion is made in a light most favorable to the prosecution, a rational trier of fact could have found that the essential elements of the crime were established beyond a reasonable doubt. *People v Hampton,* 407 Mich 354, 368; 285 NW2d 284 (1979), *People v Walker,* 93 Mich App 189, 196; 285 NW2d 812 (1979). Our review of the prosecution's proofs convinces us that the trial court's ruling was correct. We find the case at bar on all fours with our Supreme Court's recent decision in *People v Thomas,* 407 Mich 936; 285 NW2d 658 (1979), although we note that the precise question raised by the defendant in *Thomas* was the suffi-

ciency of the evidence in support of a verdict of guilty following a bench trial, whereas here, we review the lower court's denial of a motion for a directed verdict of acquittal.

The evidence offered during trial established that defendant and Marketta Landrum entered the Bottom Half Clothing Store and that, while Landrum was looking around other parts of the store, defendant talked to a clerk concerning a purchase and had the clerk fill out a form from the Community Action Program for the purchase of an item which required the clerk to go into the back room of the store and obtain the store's stamp. Sometime during this exchange, Landrum was able to take six shirts, hangers and all, and place them in her purse. Prior to leaving, both defendant and Landrum asked the clerk for empty Bottom Half bags which the clerk supplied to them. Defendant and Landrum then went to the Kinney shoe store where, while Landrum was looking at certain handbags in the store, defendant had a clerk fit her for a pair of shoes and again fill out a purchase requisition from the Community Action Program. While the clerk was filling out this form, defendant went over to talk with Landrum by the handbags. Then, both left the store together. Upon leaving the shoe store, the clerk in the shoe store saw a handbag, which had been on display in that store, lying on the floor. It contained several hangers from the Bottom Half store. The clerk from the Bottom Half store, who had discovered the theft and become suspicious of defendant and Landrum, had followed them to the shoe store. There, she observed defendant and Landrum leaving the shoe store with Landrum now carrying a Bottom Half bag which, it developed, contained the six shirts, ab-

sent the hangers, that had just been taken from the Bottom Half store. Four of the six shirts no longer had tags when found in the Bottom Half bag which Landrum was carrying. Moreover, defendant was in possession of a razor knife peculiarly suited for removing such price tags, as well as a jackknife also capable of performing such a task.

Reasonable inferences which could be drawn from this evidence are that defendant distracted the clerk at the Bottom Half in order to facilitate the theft of the shirts by Landrum and then, later, similarly distracted the clerk at the Kinney shoe store in order to assist Landrum in concealing the stolen shirts and in getting rid of the hangers. So, too, circumstances point to defendant's role in removing the tags from the shirts or, at least, aiding that action. Thus, we conclude, much as did the Court in *Thomas,* that a rational trier of fact could find that all the elements of aiding and abetting the crime of larceny in a building were established beyond a reasonable doubt. No error or prejudice to defendant resulted from the trial court's denial of defendant's motion for directed verdict.

Defendant further predicates reversible error upon the admission into evidence of the two knives found in her purse by deputy Purucker, arguing that they were the fruits of an illegal search and subject to the operation of the exclusionary rule. The prosecution argues that the consent obtained from defendant prior to the search of her purse vitiates any claim of illegality stemming from the search.

We agree with the prosecution, for we find that, under the totality of the circumstances extant at the time the consent was obtained, such consent

was given voluntarily, and the search was, therefore, valid. *People v Turner,* 62 Mich App 467, 470-473; 233 NW2d 617 (1975), *lv den* 395 Mich 799 (1975), *People v Ricky Smith,* 85 Mich App 32, 37, 46; 270 NW2d 697 (1978), see also, *People v Reed,* 393 Mich 342, 360-366; 224 NW2d 867 (1975), *cert den* 422 US 1044, 1048; 95 S Ct 2660, 2665; 45 L Ed 2d 696, 701 (1975). Accordingly, the knives were properly allowed into evidence.

As a final argument, defendant contends that her admission that she carried the knives found in her purse for purposes of self-protection was obtained by means of an impermissible "interrogation" conducted in violation of *Miranda* and its progeny. It was admitted by the arresting sheriff's deputies that defendant was not informed of her *Miranda* rights prior to her making the statement in question.[2] The prosecution, however, contends that no "interrogation" took place and that defendant merely uttered a spontaneous, in-custody declaration which does not fall within the purview of the *Miranda* protections.[3] The question for decision is whether the police actions in this case constituted "interrogation" under *Miranda.* As noted hereinbefore, the police activity claimed to be tantamount to interrogation occurred when deputy Purucker removed the knives from defendant's purse and held them up to her.

In *Rhode Island v Innis,* 446 US 291; 100 S Ct 1682; 64 L Ed 2d 297 (1980), the United States Supreme Court addressed the question of what constitutes "interrogation" under *Miranda.* After

---

[2] In Michigan, *Miranda* warnings are required to be given once an investigation has focused on a particular suspect, even if the suspect is not in custody. *Reed, supra, People v Ridley,* 396 Mich 603; 242 NW2d 402 (1976), *People v Brannan,* 406 Mich 104, 118; 276 NW2d 14 (1979).

[3] See *People v Terry,* 86 Mich App 64, 67-68; 272 NW2d 198 (1978), *People v Nard,* 78 Mich App 365, 377-378; 260 NW2d 98 (1977).

noting that not all statements obtained by police after a person has been taken into custody are considered products of "interrogation" and that volunteered statements of any kind are not barred by the Fifth or Fourteenth Amendments, the Court indicated that "interrogation", as contemplated in *Miranda,* must reflect a measure of compulsion above and beyond that inherent in custody itself. The Court continued:

"We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." 100 S Ct 1689-1690. (Footnotes omitted.) (Emphasis in the original.)

We, therefore, must measure the police actions in the case at bar against the above standard in

order to determine whether it was the "functional equivalent" of interrogation.

In *Innis,* the police had arrested the suspect in an area near a school for handicapped children. Enroute to the police station, two patrolmen conversed regarding their fears that a missing shotgun (the weapon used by Innis to commit two robberies, as well as a murder) might be found by a handicapped child who would possibly injure or kill himself or herself. Overhearing this conversation, Innis told the police he would take them to the shotgun. The Supreme Court concluded that the officers' conversation did not amount to interrogation, as it was not reasonably likely to elicit an incriminating response from Innis.

Turning to the facts of the instant case, we likewise conclude that the deputy's isolated act of holding up the knives in front of defendant was *not* a practice which the officer should have known would be reasonably likely to elicit an incriminating response.[4] Defendant's response was an unforeseeable result of the brief, unembellished gesture of deputy Purucker. This is particularly true since the response related to an offense other than that which the officer was investigating. Thus, his act was not the functional equivalent of interrogation, and defendant's spontaneous declaration was admissible into evidence.

To summarize, we find no error necessitating remand or reversal in this case, and, therefore, we affirm defendant's conviction and sentence.

Affirmed.

---

[4] There is nothing in the record to indicate that deputy Purucker was aware of any unusual susceptibility of the defendant herein to any particular form of persuasion, whether by word or deed, or that the officer perceived defendant to be unusually disoriented or upset at the time he showed her the knives. Both considerations are factors which *Innis, supra,* intimates may affect the determination as to whether a police practice constitutes "interrogation" under *Miranda.*