STATE OF NEBRASKA, APPELLEE, V. RICHTER U. GIBSON,
APPELLANT.

422 N.W.2d 570

Filed May 6, 1988.   No. 87-675.

Thomas M. Kenney, Douglas County Public Defender, and Timothy P. Burns, for appellant.

Robert M. Spire, Attorney General, and Steven J. Moeller, for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

SHANAHAN, J.

A jury found Richter U. Gibson guilty of violating Neb. Rev. Stat. § 28-1206(1) (Reissue 1985), which prohibits a convicted felon from possessing a firearm "with a barrel less than eighteen inches in length." In his appeal, Gibson does not contest the sufficiency of evidence for the conviction, but does contend that the district court erred in overruling Gibson's motion to suppress an oral statement made to police at the time of his arrest and in admitting that statement as evidence in Gibson's trial.

Before trial, Gibson moved for suppression of his oral statement. See Neb. Rev. Stat. § 29-115 (Reissue 1985) (proceedings for suppression of a statement obtained by violation of a defendant's constitutional rights). In his suppression motion, Gibson alleged that his oral custodial statement was made without the antecedent *"Miranda* warning." See *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

At the suppression hearing, Paul W. Briese, an officer in the narcotics unit of the Omaha Police Division, testified about the circumstances surrounding Gibson's statement in question.

Police had obtained a warrant to search premises designated as 3504 North 24th Street in Omaha, which was the duplex residence of Gayle Eagle Feather. Gibson shared the residence with Eagle Feather. The warrant authorized a premises search for "[m]arijuana its derivatives and administrating instruments either homemade or manufactured. Monies and records pertaining to an illegal narcotics operation and records pertaining to the occupants of 3504 North 24th Street, Omaha, Douglas County, Nebraska." At approximately 11:30 a.m. on December 4, 1986, and equipped with the search warrant, Officer Briese and five other narcotics officers went to the residence described in the search warrant to search for contraband "drugs." Some of the officers wore vest-like jackets bearing the visible inscription "Omaha Police" on the front and back of such vests. When the officers arrived at the duplex, the front door was unlocked. The officers entered through the front door, announcing: "Police officers, search warrant."

In the residence the officers found Gibson with Eagle Feather and her two children. Briese handed Gibson a copy of the search warrant. While Eagle Feather remained with some officers in the residence's living room-dining room area, Briese and other officers undertook a search which, after a half hour, brought them into the residence's kitchen. Before entry into the kitchen, the officers had not questioned Gibson and had not given him the *Miranda* warning. In the kitchen, Briese, who was accompanied by two other officers, directed Gibson "to sit down and not try to leave." Officer Briese acknowledged that Gibson was not free to leave the kitchen or premises. While searching in the kitchen's wall cupboard, Officer Briese discovered a loaded "stub-nose" .38-caliber revolver. Displaying the discovered revolver, Briese remarked: "Oh, look what I found." As an immediate response to the officer's remark, Gibson stated: "That's my gun, and I use it for protection."

Briese explained his comment on discovering the revolver. First, Briese's comment was not directed toward Gibson alone but was made for all—"everybody"—to hear. Second, Briese's reason for his comment was:

Because I made the statement to everybody in the room

> "Oh, look what I found," meaning that I wanted to alert everybody in the room that was present that I had located a firearm. . . . Because it is a firearm, it means it could have been used against us, it was something that I wanted to alert the officers to the fact that we had found the gun. . . . [I]t was worth noting to the other officers.

In the remainder of their search, the officers found a "controlled substance." Police gave the *Miranda* warning to Gibson, who declined to talk with the officers. Apparently by radio, an officer inquired about the registration of the revolver which Briese had discovered. Based on the revolver's serial number, the officer determined that the firearm was unregistered and, when checking whether Gibson had a criminal record, ascertained that Gibson was a convicted felon. Police arrested Gibson.

In his further testimony at the suppression hearing, Officer Briese testified that Gibson was not under the influence of alcohol or drugs and was calm throughout the search of the duplex.

The district court concluded that Gibson's statement was not made in response to custodial interrogation by police and overruled Gibson's suppression motion. At trial and over objection by Gibson's counsel, Officer Briese testified substantially in accord with his testimony at the suppression hearing, including the circumstances surrounding discovery of the .38-caliber revolver and Gibson's statement concerning the discovered revolver. After the verdict of guilty, the court sentenced Gibson to imprisonment for 1 to 2 years.

Gibson contends his oral statement, when Officer Briese discovered the revolver, should have been suppressed and excluded from evidence because police had not administered the *Miranda* warning before Gibson's statement.

" ' " 'In determining the correctness of a trial court's ruling on a motion to suppress, the Supreme Court will uphold the trial court's findings of fact unless those findings are clearly erroneous. . . .' " ' " *State v. Blakely*, 227 Neb. 816, 820, 420 N.W.2d 300, 303 (1988) (quoting *State v. Vrtiska*, 225 Neb. 454, 406 N.W.2d 114 (1987)).

There is no question that Gibson was in custody when he

made the statement in question. Officer Briese emphatically instructed Gibson to remain in the kitchen, where Gibson was not free to leave the officer's presence.

" 'Custodial interrogation' has been characterized by the U.S. Supreme Court in *Miranda* as 'questioning instigated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " *State v. Bodtke*, 219 Neb. 504, 509, 363 N.W.2d 917, 921 (1985) (quoting *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966)).

Before a defendant's custodial statement is admissible as evidence, the absolute and indispensable prerequisites of the *Miranda* warning must have been satisfied preceding the interrogation producing such statement, namely, law enforcement personnel must (1) inform the defendant of the right to remain silent, (2) explain that anything said can and will be used against the defendant in court, and (3) inform the defendant of the right to consult with a lawyer, retained or court-appointed, and to have a lawyer present during interrogation. *State v. Norfolk*, 221 Neb. 810, 381 N.W.2d 120 (1986).

According to the U.S. Supreme Court, a purpose of the *Miranda* warning is "preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment." *Arizona v. Mauro*, ____ U.S. ____, 107 S. Ct. 1931, 1936-37, 95 L. Ed. 2d 458 (1987).

Consequently, Gibson made a custodial oral statement to police. However, the question is: Was Gibson's custodial statement the product of police interrogation?

In *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), the U.S. Supreme Court expanded "custodial interrogation" beyond express questioning of a defendant while in police custody. Police arrested Innis for a robbery perpetrated with a sawed-off shotgun and advised Innis of his *Miranda* rights before transporting him to the police station. Innis stated that he understood such rights and wanted to talk with a lawyer. The police had not located the shotgun used in the robbery. While accompanying Innis to the

station, officers talked among themselves regarding the missing shotgun, which conversation included comments by the officers concerning the possible tragedy of a child's finding the loaded shotgun and receiving an injury from that weapon. Innis interrupted the officers' conversation and told the officers that, if they would return to the arrest scene, he would locate the shotgun for the police. Near the arrest scene, Innis led police to the missing shotgun. In considering whether Innis' actions in pointing out the shotgun were the product of interrogational compulsion by police, the U.S. Supreme Court stated:

The issue, therefore, is whether the respondent was "interrogated" by the police officers in violation of the respondent's undisputed right under *Miranda* to remain silent until he had consulted with a lawyer. In resolving this issue, we first define the term "interrogation" under *Miranda* before turning to a consideration of the facts of this case.

The starting point for defining "interrogation" in this context is, of course, the Court's *Miranda* opinion. There the Court observed that "[b]y custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.*, at 444 (emphasis added). This passage and other references throughout the opinion to "questioning" might suggest that the *Miranda* rules were to apply only to those police interrogation practices that involve express questioning of a defendant while in custody.

We do not, however, construe the *Miranda* opinion so narrowly. The concern of the Court in *Miranda* was that the "interrogation environment" created by the interplay of interrogation and custody would "subjugate the individual to the will of his examiner" and thereby undermine the privilege against compulsory self-incrimination. *Id.*, at 457-458. The police practices that evoked this concern included several that did not involve express questioning. For example, one of the practices discussed in *Miranda* was the use of line-ups in which a coached witness would pick the defendant as the

perpetrator. This was designed to establish that the defendant was in fact guilty as a predicate for further interrogation. *Id.*, at 453. A variation on this theme discussed in *Miranda* was the so-called "reverse line-up" in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime, with the object of inducing him to confess to the actual crime of which he was suspected in order to escape the false prosecution. *Ibid.* The Court in *Miranda* also included in its survey of interrogation practices the use of psychological ploys, such as to "posi[t]" "the guilt of the subject," to "minimize the moral seriousness of the offense," and "to cast blame on the victim or on society." *Id.*, at 450. It is clear that these techniques of persuasion, no less than express questioning, were thought, in a custodial setting, to amount to interrogation.

This is not to say, however, that all statements obtained by the police after a person has been taken into custody are to be considered the product of interrogation. As the Court in *Miranda* noted: "Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. *The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated.* . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today." *Id.*, at 478 (emphasis added). It is clear therefore that the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. "Interrogation," as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself.

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to

> say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response. [Emphasis in original.]

*Rhode Island v. Innis*, 446 U.S. 291, 298-302, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980).

In *Innis*, the Court also noted:

> This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.

*Id.* at 301-02 n.7.

The *Innis* Court further noted:

> Any knowledge the police may have had concerning the unusual susceptibility of a defendant to a particular form of persuasion might be an important factor in determining whether the police should have known that their words or actions were reasonably likely to elicit an incriminating

response from the suspect.

*Id*. at 302 n.8.

Finally, the Court, in *Rhode Island v. Innis, supra*, concluded that there was no interrogation within the meaning of *Miranda* because the police had not subjected Innis to the "functional equivalent" of express questioning. According to the U.S. Supreme Court:

> The case thus boils down to whether, in the context of a brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of no more than a few offhand remarks, we cannot say that the officers should have known that it was reasonably likely that Innis would so respond. This is not a case where the police carried on a lengthy harangue in the presence of the suspect. Nor does the record support the respondent's contention that, under the circumstances, the officers' comments were particularly "evocative." It is our view, therefore, that [Innis] was not subjected by the police to words or actions that the police should have known were reasonably likely to elicit an incriminating response from him.

*Id*. at 303.

Therefore, as concluded in *Innis, supra*, the *Miranda* warning is required before a defendant's custodial statement, as the product of express questioning or its functional equivalent, is constitutionally admissible as evidence against the defendant.

As we interpret *Innis, supra*, to determine whether there is interrogation within the meaning of *Miranda*, an objective standard is applied: Would a reasonable and disinterested person conclude that police conduct, directed to a suspect or defendant in custody, would likely elicit an incriminating response from that suspect or defendant? See 1 W. LaFave & J. Israel, Criminal Procedure § 6.7 (1984). If the answer is "yes," there is interrogation requiring the *Miranda* warning before a defendant's incriminating response is constitutionally admissible as evidence against the defendant.

According to *Innis*, some factors which may be considered in

determining whether there has been interrogation within the meaning of *Miranda* are a police practice designed to elicit an accused's incriminating response and a defendant's susceptibility to respond to a particular persuasion.

*Rhode Island v. Innis, supra,* has been applied in decisions of this court to determine whether a defendant's oral statement was the product of the "functional equivalent" of custodial interrogation by police. See, *State v. Whitmore,* 221 Neb. 450, 378 N.W.2d 150 (1985): officer's question about ownership of keys found in room where defendant was present was a neutral question, resulting in a spontaneous reaction; *State v. Taylor,* 221 Neb. 114, 115, 375 N.W.2d 610, 612 (1985): during a booking procedure, the defendant's volunteered statement, " 'It can't get much worse than this' " was not the product of interrogation; *State v. Parsons,* 213 Neb. 349, 328 N.W.2d 795 (1983): without interrogation, the defendant admitted he was responsible for the marijuana which was the subject of a criminal charge of possession of marijuana with intent to distribute; *In re Interest of Durand. State v. Durand,* 206 Neb. 415, 420, 293 N.W.2d 383, 386 (1980): showing a defendant police reports of unsolved burglaries, after the defendant had asserted his right to remain silent and terminated conversation with police, was "the functional equivalent of questioning" which produced defendant's self-incriminating statement.

In addition to application of *Rhode Island v. Innis,* 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), to determine whether a suspect or defendant was subjected to the "functional equivalent" of custodial interrogation, this court has also held that a "spontaneously volunteered statement" of a suspect or defendant is admissible in the absence of the *Miranda* warning. *State v. Red Feather,* 205 Neb. 734, 738, 289 N.W.2d 768, 771 (1980). See, also, *State v. Taylor, supra* (" 'Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence,' " 221 Neb. at 116, 375 N.W.2d at 612-13).

In Gibson's case, Officer Briese's remark, "Oh, look what I found," was not express questioning of Gibson. However, we must now determine whether Officer Briese's remark was conduct directed to Gibson, which the officer should have

known was likely to evoke an incriminating response from Gibson. See *Rhode Island v. Innis, supra.*

In *State v. Finehout*, 136 Ariz. 226, 665 P.2d 570 (1983), police detectives repeatedly urged the defendant, who had refused to talk to the detectives, to tell the truth, and appealed for the defendant's honesty through their remarks, such as " 'it's just better to tell the truth and get out in the open.' " *Id*. at 230, 665 P.2d at 574. The Arizona Supreme Court determined that "the detectives' repeated urging of the defendant to tell the truth was, under the circumstances, interrogation because the detectives should have known that their appeals for honesty were reasonably likely to elicit an incriminating response." *Id*.

*United States v. Suggs*, 755 F.2d 1538 (11th Cir. 1985), involved an incriminating statement made when Suggs was shown a copy of the indictment charging him with falsifying travel vouchers and responded: " '[H]ell, everybody cheats on their travel vouchers,' " and " '[E]verybody falsifies their travel vouchers.' " *Id*. at 1541. In finding that Suggs' statements were constitutionally admissible evidence, the court stated: "[T]he evidence reasonably supports the trial court's finding that defendant's comment was a spontaneous exclamation not prompted by any questioning. The trial court apparently found that Suggs made the statement not as a result of any Government probing, but spontaneously after he was shown his indictment." *Id*. at 1541-42.

In *People v Benjamin*, 101 Mich. App. 637, 300 N.W.2d 661 (1980), officers were investigating a shoplifting charge against Benjamin and found a "razor knife and a jackknife" in Benjamin's purse. *Id*. at 641, 300 N.W.2d at 663. When a deputy sheriff, Purucker, removed the knives from the purse and showed Benjamin the knives, Benjamin said: " 'I carry them when I'm walking down Frances Street, never know when I might need them'." *Id*. at 642, 300 N.W.2d at 663. Benjamin had not been given the *Miranda* warning before she made the statement about the knives. Benjamin was charged and convicted of carrying a concealed weapon. Referring to *Rhode Island v. Innis*, the court concluded that Benjamin's statement regarding the knives was not a response to the "functional equivalent" of interrogation and stated:

[T]he deputy's isolated act of holding up the knives in front of defendant was *not* a practice which the officer should have known would be reasonably likely to elicit an incriminating response. Defendant's response was an unforeseeable result of the brief, unembellished gesture of deputy Purucker. This is particularly true since the response related to an offense other than that which the officer was investigating. Thus, his act was not the functional equivalent of interrogation, and defendant's spontaneous declaration was admissible into evidence.

(Emphasis in original.) 101 Mich. App. at 649, 300 N.W.2d at 667. In *Benjamin*, the court also noted, *id*. at n.4:

There is nothing in the record to indicate that deputy Purucker was aware of any unusual susceptibility of the defendant herein to any particular form of persuasion, whether by word or deed, or that the officer perceived defendant to be unusually disoriented or upset at the time he showed her the knives.

In *State v. Grisby*, 97 Wash. 2d 493, 647 P.2d 6 (1982), Grisby and his eventual codefendant, Frazier, were implicated in a criminal homicide. Police arrested Frazier, who, having been given the *Miranda* warning, refused to talk to the police. While a detective was placing a clear plastic bag of money on a table in Frazier's view, Frazier asked the detective what he was doing with the money. When the detective responded that he was going to place the bag of money with other evidence regarding the homicide investigation, Frazier spontaneously said:

"That's my money. It's not hot. I didn't steal nothing from that apartment. I shot the people, but I didn't steal nothing. I shot the people, but I didn't steal no drugs or money. The money belongs to me. I feel bad about the kids, but I'm a bad shot. They started it all. They gave me a hot shot. I was sick for three days. They put a gun up to my head and burned some of my money. They had it coming, but I didn't mean to hurt the kids."

*Id*. at 504, 647 P.2d at 12-13. In holding that Frazier's statements did not violate the "*Miranda* rights," the Supreme Court of Washington stated:

The statement was made after the interrogation had been

completed and it was Frazier who asked the question and received an answer. The police did not ask him anything, he simply made the above statement. "[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." [Emphasis in original.] *Rhode Island v. Innis, supra* at 301-02. . . .

These acts occurred while the police officers were separating the physical evidence after the interrogation had terminated. . . . There is nothing in the record to indicate the police should have known these actions were "reasonably likely" to induce the statement from Frazier. The placing of the bag on the desk and the answer to the question posed by Frazier do not constitute the "functional equivalent" of express questioning which the court in *Innis* deemed a prerequisite to the invocation of the *Miranda* safeguards.

97 Wash. 2d at 504-05, 647 P.2d at 13.

In the light of *Rhode Island v. Innis*, 446 U.S. 291, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980), and the decisions mentioned from other jurisdictions, we find that Gibson's statement, made when he saw the revolver displayed by Officer Briese, is constitutionally admissible evidence. Officers went to Eagle Feather's residence to search for contraband or illicit controlled substances and other items related to illegal use or trafficking in controlled substances. The district court may have concluded that Officer Briese's remark was a precautionary measure to alert officers about the possible presence of other firearms on the premises and accessible to Gibson or Eagle Feather, especially since the officers were still in the process of their search. As such measure, Officer Briese's remark was not directed to Gibson. Mere display of the discovered revolver cannot be categorically characterized as "[a] practice that the police should know is reasonably likely to evoke an incriminating response from a suspect . . . ." *Rhode Island v. Innis, supra* at 301. Although Gibson's statement in response to

the discovered and displayed revolver may be on the cutting edge of immeasurable imprudence, Gibson's statement was not the product of interrogation within the meaning of *Miranda*. Rather, Gibson made a spontaneously volunteered statement, "That's my gun," a totally unsolicited and unexpected response under the circumstances. "[S]ince the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (Emphasis in original.) *Rhode Island v. Innis, supra* at 301-02. Police conduct which results in an unforeseeable or volunteered response by a defendant is not interrogation within the meaning of *Miranda*, requiring the *Miranda* warning before that response is constitutionally admissible as evidence against the defendant.

Most assuredly, Gibson's response to the discovery and display of the revolver was relevant evidence at Gibson's trial. See Neb. Evid. R. 401 (relevant evidence, defined) (Neb. Rev. Stat. § 27-401 (Reissue 1985)).

The district court was correct in overruling Gibson's suppression motion and in admitting Gibson's statement as evidence in Gibson's trial.

AFFIRMED.